# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

### No. 23-3034

_____

**UNITED STATES OF AMERICA,**                            **Appellee,**

**v.**

**NIZAR TRABELSI,**                            **Appellant.**

_____

## RESPONSE IN OPPOSITION TO APPELLEE'S
## MOTION FOR SUMMARY AFFIRMANCE

Appellee's Summary Affirmance Motion cannot support the

"heavy burden" this Court imposes before it will undertake the unique

action of summarily disposing of an appellant's appeal on the merits

without full briefing. *United States v. Allen,* 408 F.2d 1287, 1288 (D.C.

Cir. 1969) (per curium). First, before summary affirmance can issue,

appellee's Motion must "demonstrate that the merits of the claim are so

clear as to justify expedited action," *Walker v. Washington,* 627 F.2d

541, 545 (D.C. Cir.) (per curium), *cert. denied,* 449 U.S. 994 (1980).

Second, it must show that further briefing and argument are not

necessary. *See Ambach v. Bell,* 686 F.2d 974, 979 (D.C. Cir. 1982) (per

1

curiam); *accord,* United *States v. Allen,* 408 F.2d 1287, 1288 (D.C. 1969)

Appellee's Motion makes neither showing.

Contrary to appellee's argument, Trabelsi's appeal does not

merely seek reconsideration of this Court's prior two decisions in *United*

*States v. Trabelsi,* 28 F.4th 1291 (D.C. Cir. 2022) ("*Trabelsi V"); and*

*United States v. Trabelsi,* 845 F.3d 1181 (D.C. Cir. 2017) ("*Trabelsi II").*

Instead, it satisfies this Court's requirement for full review by

presenting significant new evidence not earlier obtainable. *See, United*

*States v. Bell,* 5 F.3d 64, 67 (4th Cir. 1993). That evidence includes: a

September 12, 2022 Judgment by the Brussels Court of Appeals; a

December 7, 2022 Letter from the Belgium Minister of Justice notifying

the U.S. Department of Justice of the Court's Judgment; and a

December 13, 2022 Diplomatic Notice by the Kingdom of Belgium

requesting Trabelsi's return under the Judgment.

Applying this Court's reasoning in *Trabelsi V,* the 2022 Diplomatic

Notice constitutes an act of state by the executive of Belgium for

Trabelsi's return. *See, Trabelsi V,* 28 F.4th at 1299. And because the

Notice's language does not evidence conflicting legal interpretations

between the country's executive and its judicial authorities it should be

honored. *Id.* Consistently, the *Trabelsi V* Court ruled that "[i]n the context of extradition proceedings, courts have refrained from finding extradition orders issued by the state's executive invalid under the act of state doctrine." Accordingly, appellee's motion for summary affirmance to the contrary should be denied.

## SUMMARY OF THE ARGUMENT

Trabelsi's appeal seeks this Court's review of new evidence chiefly in the form of a 2022 Diplomatic Notice issued by the executive of Belgium that includes, for the first time, a 2022 Judgment by the Brussel's Court of Appeals requesting the "return of Nizar Trabelsi and to discuss the conditions of his return." *See* Brussels Court of Appeals Interlocutory Ruling, Docket No. 2020/AR/508 at ¶ 76 (Sep. 12, 2022) (hereinafter "2022 COA" at Ex. 3); *see also,* "2022 Diplomatic Notice" at Ex. 1. In addition, and also for the first time, the executive's Notice fails to expressly state any disagreement with the court's request for return. *Id.* In these two ways, the 2022 Notice provides new evidence— evidence significantly different from that contained in the 2014 and 2019 Notices reviewed in *Trabelsi II or Trabelsi V,* respectively.

3

This Court's analysis in *Trabelsi V* focused on the text of the language in the 2019 Diplomatic Notice and Article 5 of the Belgium Extradition Treaty with the United States. *Trabelsi V*, 28 F.4th 1299, citing, *Medellin v. Texas,* 552 U.S. 491 (2008). In *Trabelsi V,* the Court noted that the plain language in the 2019 Notice included the executive's express disagreement with the Court's 2019 Judgment. *See, Trabelsi V* , 28 F.4th 1298. Specifically, it found that the 2019 Notice stated "[t]he [2019] judgment is contrary to the Extradition order of 23 November 2011. . . ." *Id.; see* 2019 Notice at Ex. 2. As a result, the issue before the *Trabelsi V* Court then (unlike now) was which interpretation controlled when the Belgium Government and its court disagree on a Diplomatic Notice of a state act. *Id.* In contrast, the language in the 2022 Diplomatic Notice does not express any disagreement with its Court's 2022 Judgment. Thus, the evidence and issue on review here are significantly different so as to deny summary affirmance.

It is important to note that the Government's current lack of disagreement should not be read in a vacuum. In context, its new position is likely motivated by the fact that the 2022 Judgment imposed a €10,000K penalty against the Government for each of the 10 years

Trabelsi has been imprisoned in the United States. (COA p. 64, ¶76, at Ex. 3). It is also noteworthy that the European Court of Human Rights previously fined the Government €90,000K in damages for inappropriately extraditing Trabelsi to the United States for trial on the same offense he had served 10 years for in Belgium. *See,* Council of Europe, European Court of Human Rights, Press Release ECHR 247, p. 4 (April 9, 2014). And in February 2022, a special envoy from the United Nations visited Trabelsi and wrote a Mandates of the Special Rapporteur on Torture to the United States expressing concerns about the "severe mental impact of his prolonged solitary confinement." *See,* Special Rapporteur against Torture, Special Rapporteur on the promotion and protection of human rights and fundamental freedoms . . ., (UN) p. 1 Communication to the United States of America, JAL, USA 1/2022 (25 Feb 2022) https://spcommreports.ohchr.org/, (hereinafter "UN Special Rapporteur" at Ex. 5). Finally, by Letter dated December 7, 2022 the Belgian Minister of Justice notified the U.S. Department of Justice of the Court of Appeals' 2022 Judgment and its request that Trabelsi be allowed medical visits. (2022 Ltr. at Ex. 4).

Mr. Trabelsi is a 53-year-old, non-native speaker, in poor health, who has been incarcerated for 21 years. The last 10 years of incarceration have been in solitary confinement in the United States under Special Administrative Measures. In July 2022, after acknowledging Trabelsi had no legal training or trial experience, the district court ruled he could represent himself during his eight-week jury trial beginning May 8, 2023. In March 2023 Trabelsi wrote to the court stating he was not prepared. Thereafter, standby counsel filed a Motion for a medical evaluation to determine Trabelsi's fitness to represent himself in such a long jury trial: the Motion was denied without a hearing. (Order[1] at Ex. 9).

Because this appeal seeks review of new and significant evidence not previously adjudicated in this Circuit's prior opinions, appellee's motion for summary affirmance should be denied and full briefing ordered. In addition—consistent with the request presented in the Court of Appeal's 2022 Judgment, as conveyed without objection by the Minister of Justice's 2022 letter to the U.S. Department of Justice, and

---

[1] "Doc. No. __" refers to the docket number of the document as identified on the U.S. District Court's Docket Sheet for *United States v. Trabelsi,* 06-cr-0089.

also as consistent with Sixth Amendment guarantees—appellant seeks

a limited remand ordering medical visits and an evaluation.

## ARGUMENT IN RESPONSE

**I.    Summary Affirmance is Not Warranted**

    A.    The Belgium Executive's 2022 Diplomatic Notice, and the
2022 Judgment from the Brussels Court of Appeals,
Constitute New Evidence Warranting Full Briefing

This appeal is meritorious because it seeks review of an entirely

different 2022 Diplomatic Notice and Judgment by the Brussels Court

of Appeals than previously reviewed by this Circuit. Notably, the

language in the 2022 Diplomatic Notice differs from that in its 2014 and

2019 Notices reviewed in *Trabelsi V*.  Consistent with this Circuit's

reasoning in *Trabelsi V,* and prevailing cannons of interpretation, this

Court's review rests on a textualist reading of the plain language in the

2022 Notice. *Trabelsi V* , 28 F.4th at 1299; *see also,* Scalia & Garner,

<u>Reading Law: The Interpretation of Legal Text,</u> pp 56-59, 93-100 (1st

Ed. 2012) (hereinafter "<u>Reading Law</u>).

Comparing the language in the Belgium Executive's 2019 Notice,

to its 2022 Notice, the latter presents new evidence for this Court's

review in two respects.  First, the 2022 Notice contains *no express*

*language* that it now disagrees with its Court's 2022 Judgment on its

request for Trabelsi's return. (2022 Notice at Ex. 1; *compare*, 2019

Notice at Ex. 2). Nor does the language in the 2022 Notice incorporate

the disagreement found in its 2014 and 2019 Notices by reference. *Id.*

Second, the language in the 2022 Notice includes—for the first time—

an affirmative request for "the return of Nizar Trabelsi and to discuss

the conditions of his return" in fulfillment of the court's 2022 Judgment.

*Id.* Thus, the plain language in the Notices differs as follows:

| *2022 Belgium Diplomatic Notice To U.S. Embassy* | *2019 Belgium Diplomatic Notice To U.S. Embassy* |
|---|---|
| On September 12, 2022, the Brussels Court of Appeals ordered the Belgian Government to request by diplomatic note the return of Nizar Trabelsi and to discuss the conditions of his return. The Government of Belgium submits this Diplomatic Note, with the abovementioned request, in fulfillment of the order. | The Government of Belgium has the honor to refer to its 23 November 2011 decision to grant the extradition of Nizar Trabelsi for trial in the United States District Court for the District of Columbia on the charges set out in the indictment pending in 06-089.<br><br>It has come to the attention of the Mnistry of Justice that counsel for Nizar Trabelsi has filed a motion to reconsider motion to dismiss for violation of the Extradition Treaty. . . . *The motion is based upon the 8 August 2019 judgment by the Court of Appeal of Brussels.* This judgment was notified to the U.S. Justice Department on 9 August 2019. . . . . . . . *The judgment is contrary to the Extradition order of 23 November* |

|  | *2011 and in our view, therefore contrary to the clear wording of article 5 of the Treaty.* For this reason, the Belgian Government has appealed the judgment before the Supreme Court.<br><br>    *Therefore, the Ministry of Justice confirms, as stated in the diplomatic note no. C1.2/33 of 29 October 2014.* .<br><br>[The 2019 Notice then continues in the same disagreeable vein for an additional four paragraphs.] |
|---|---|

(2022 and 2019 Diplomatic Notices at Exs. 1 & 2, respectively (emphasis added)).

Under the well-settled Supremacy-of-Text Principle of interpretation, the language in the Government's 2022 Notice must be read as it is—*sine* disagreement by the Government. As directed by Scalia and Garner's renowned work <u>Reading Law,</u> "[t]he words of a governing text are of paramount concern, and what they convey, in their context, is what the text means." <u>Reading Law,</u> supra., p. 56. Consistently, this Court's analysis in *Trabelsi V,* focused on the text of the language in the 2019 Diplomatic Notice affirming dismissal. *See, Trabelsi V*, 28 F.4th 1299, citing, *Medellin v. Texas,* 552 U.S. 491 (2008). From that focus, the Court turned to the text of the 2019 Notice and

found it disagreed with the Court of Appeal's Judgment because it "characterized the August 2019 Court of Appeal judgment as contrary to the Extradition Order." *Id.* at 1302.

Further comparison of the texts in the two Notices reveals that the Government knew how to express its disagreement with its Courts' Judgments and chose not to do so in its 2022 Notice—three years later. Employing the Omitted-Case, and the Negative-Implication, Cannons of interpretation the district court erred in reading into the 2022 Diplomatic Note a disagreement by the Government that its text had abandoned. Reading Law, *supra*. pp. 93 & 107. Accepting the text of the 2022 Diplomatic Notice, the Executive facially agrees with (at best), or acquiesces to (at a minimum), the request for Trabelsi's return.

Thus, this appeal raises an issue not previously before the Court. That issue concerns the United States' response to a Government Notice which facially agrees with its Court of Appeal's request for an extradited defendant's return. Indeed, this appeal, and the 2022 Notice and Judgment it turns on, seeks review of a *unified* 2022 Diplomatic Notice. Consequently, it presents "'significant new evidence, not earlier obtainable in the exercise of due diligence'" and summary affirmance is

inappropriate. *Id.* at 1298, quoting *United States v. Bell,* 5 F.3d 64, 67

(4th Cir. 1993) (internal quotation marks and citation omitted);

*LaSHawn A. v. Barry,* 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc).

Appellee's reliance on *United States v. Glover,* 731 F.2d 41 (D.C.

Cir. 1984) to the contrary is misplaced.  The relevant facts in *Glover* are

distinguishable. *Id.*  In *Glover,* unlike here, the issue was whether

summary affirmance was appropriate where the government sought the

immediate *retrial* of a defendant on a domestic issue of criminal law.

The *Glover* court found summary affirmance appropriate because there

(unlike here) the appeal was based on:

> [U]ndisputed facts and presents a single uncomplicated legal
> issue to be decided in an area where the case law is well
> developed.

*Id.* at 45.  In contrast, Trabelsi's appeal presents disputed facts in the

form of significant new evidence and an original issue. Appellee's

unmoored concerns about the potential unavailability of an unnamed,

not counted number of potential witnesses are insufficient to show

irreparable harm. To the contrary, it is Trabelsi who will suffer

irreparably by being rushed to represent himself in an 8-week jury trial,

in a language he barely knows, without legal training, and in a manner

that cannot guarantee his Sixth Amendment right to a fair trial. *See, Indiana v. Edwards,* 554 U.S. 164, 185 (2008), quoting, *United States v. Gonzalez-Lopez,* 548 U.S. 140, 145 (2006) ("[T]he purpose of the rights set forth in [the Sixth] Amendment is to ensure a fair trial.").

   B.   The *Trabelsi V* Court rejected Appellee's Argument
        that the Government's Diplomatic Notice Does Not
        Constitute an Act of State

   Appellee's argument, that the 2022 Diplomatic Notice is not an Act of State but a mere document of notice, lacks support for three reasons. First, all of the government's representations to the district court referred to the Notice as a "diplomatic note" from the Belgium executive.  For example, in its January 19, 2023 Status Report to the district court, the government declared that a "diplomatic note" was sent from the "Belgian [sic] Government to request by diplomatic note the return of defendant Trabelsi and to discuss the conditions of his return." (Dkt. No. 500). At no time did the government claim it was actually just a "letter" from the Minister of Justice.  This Court should reject appellee's attempt to do so now.

   Second, in *Trabelsi V,* this Court rejected appellant's argument that the March 5, 2020 Letter from the Minister of Justice amounted to

an "act of state" representing the Belgium state's position (or vice versa). *Id.* at 1301.  In rejecting this argument, the Court relied on the express language in the Minister of Justice's letter. Specifically, the Court was swayed by the text of the letter's subject heading which reads: Nizar Trabelsi. *notification of Judgment* of the First Instance (Civil) Court for Brussels." (Ltr. at Ex. 6) (emphasis added).  That notification language is not present in Belgium's Diplomatic Notices, which are all addressed to the Embassy of the United States in Brussels—not the U.S. Department of Justice. Consequently, the *Trabelsi V* Court ruled that "[t]he [Minister of Justice's] letter does not purport to stake out Belgium's official position on the scope of Trabelsi's extradition." *Trabelsi V*, 28 F.4th 1301.

Third, appellee's argument that the 2022 Diplomatic Notice is a mere notifying letter from the Minister of Justice is defeated by the fact that the Minister of Justice actually wrote a separate notifying letter regarding the 2022 Judgment.  By letter dated December 7, 2022 the Minister of Justice wrote to a trial attorney in the Office of International Affairs of the U.S. Department of Justice stating:

> The judgment dated September 12th 2022 by the Court of Appeals
> for Brussels ordered the Belgian Government to request the

United States to allow Nizar Trabelsi to receive the visit of a
medical doctor or medical doctors of his own choice.

(2022 Ltr. at Ex. 4). The fact that the Minister of Justice wrote a

separate Letter notifying of the Court of Appeal's 2022 Judgment

refutes appellee's argument that the 2022 Diplomatic Notice was the

same notifying document.

## II. The Minister of Justice's 2022 Letter, and the Court of Appeal's Judgment, Should Be Honored to Allow Trabelsi its Requested Medical Visits.

The 2022 Court of Appeals Judgment at issue in this appeal

contains express concerns over Trabelsi's health and conditions of

confinement. (COA ¶ 70 at Ex. 3). The Court relies on a March 2021

medical evaluation of Trabelsi which it characterizes as "very detailed,

[and] *it is not subject of any specific opposition by the Belgian State*."

(COA at ¶70, text p. 57) (emphasis added). Quoting from that

evaluation, the Court found:

> First of all, it's important to note that *Mr. Trabelsi was in solitary confinement for the duration of his incarceration in the United States*. For five years, he slept on a hard floor and there was a light on in his cell 24 hours a day. From the records I reviewed, it appears that he never went outside. Also, *since his native language is not English, he was not able to communicate effectively with anyone except in a rudimentary manner*. (*Id.* Text pp 57-58)

> \* \* \*

14

[I]n October 2020, *after an in-person court hearing, Mr. Trabelsi had a documented panic attack.* In March 2019, Mr. Trabelsi stated that he would not speak to the mental health officer Without an in-person translator in a language in which he can effectively communicate his mental health needs. No in-person translator was offered or used for medical or mental health care or treatment. *Years of isolation have most likely left him with severe psychological problems, but there appears to have been no real attempt to try to find a human being he could trust to speak to him in French.* I fear that *his withdrawal and unwillingness to be seen is evidence of severe mental distress* rather than complete mental health, as indicated on the forms. (*Id.* p. 60)

\* \* \* \*

. . . . His isolation, inability to interact with other human beings, lack of sunlight and exercise, and constant artificial light that prevents him from sleeping normally combine to affect his mind and body in severely detrimental ways. *As the months and years go by, it seems almost certain that his mental and physical condition will continue to deteriorate.*

*Id.* p. 61 (emphasis added). The evaluation also contained a laundry

list of Trabelsi's specific health problems which included depression,

anxiety, and paranoia. *Id.*

Because the Court of Appeals largely attributed Trabelsi's current

health problems to his 10 years of solitary confinement in the United

States[2], it ordered the Belgium Government to pay him €10,000.00K

---

[2] On February 25, 2022 the United Nations issued a Mandate of the Special Rapporteur to the United States concerning Trabelsi's mental health conditions noting that "Fifth and Fourteenth Amendments of the US Constitution also guarantee the fundamental right to due process."

per year of detention. (COA  at ¶ 71, p. 61).  Also, and "in order for the appellant to benefit from adequate medical care," the Court of Appeals ordered the Government to request from the American authorities that Trabelsi be allowed visits by physicians of his choice. *Id.* at ¶ 73.

In compliance with the Court of Appeal's Judgment, on December 7, 2022, the Minister of Justice wrote to the U.S. Department of Justice's Office of International Affairs and conveyed its request for "the United States to allow Nizar Trabelsi to receive a medical doctor or medical doctors of his choice." (Ltr. at Ex. 4).  In March 2023 Trabelsi wrote the court that he was not prepared to try his own case stating:

> "I'm vERy Far To be Ready FoR Trial. I Blame The p Defender FoR please. AS you kNow I'm a Foreign inmate when I came To U.S.. I DiDn'T speak 1 WoRD in English I Tried To learn isn'T easy To use The Dictionary oNly and Do NoT have CoNTACT with inmates."

(Ltr at Ex. 7) (spelling and grammar errors in original.)  Thereafter, standby counsel filed a Motion to Stay the May 8, 2023 jury trial. The Motion sought a medical evaluation to determine if Trabelsi's deteriorating cognitive abilities, and restrictive Special Administrative

---

*See,* U.N. *Special Rapporteur against Torture, supra,* Communication to the United States of America, JAL, USA 1/2022 at 3 (Feb. 25, 2022).

Measures (SAM)[3] of confinement, prevented him from effectively representing himself[4] in an 8-week jury trial. (Doc. No. 552). The district court denied the Motion ruling that "standby counsel had failed to produce any evidence that Trabelsi suffers from a 'severe mental illness,' rendering him incompetent to conduct the trial on his own." (Order at Ex. 9).

The district court erred by denying Trabelsi his requested medical assistance since the request was consistent with that made in the 2022 Court of Appels' Judgment as conveyed by the Minister of Justice's December 2022 Letter without objection, and also Sixth Amendment guarantees of the right to effective counsel. In *Indiana v. Edwards,* 128 S.Ct. 2379 (2008) the U.S. Supreme Court ruled that a defendant who is

---

[3] *See,* Allison Frankel *et al.*, *The Darkest Corner: Special Administrative Measures & Extreme Isolation in the Federal Bureau of Prisons*, Allard K. Lowenstein Int'l Human Rights Clinic, Yale Law School (Sept. 2017) at 11("There is not a single published study of solitary or supermax-like confinement in which nonvoluntary confinement lasting for longer than 10 days failed to result in negative psychological effects.")

[4] In July 2022—after acknowledging that Trabelsi did not have legal training, needed an interpreter, and did not know the federal rules of evidence or of criminal procedure—the district court allowed him to represent himself in his 8-week jury trial, post-trial, and sentencing proceedings with standby counsel as an advisor. (Order at Ex. 9).

mentally competent to go to trial is not, *ipso facto,* entitled to represent himself where the defendant otherwise suffers from mental illness. In its ruling, the Court recognized a broad range of symptoms of severe mental illness including: ""[d]isorganized thinking, deficits in sustaining attention and concentration, impaired expressive abilities, anxiety"—all symptoms Trabelsi possesses. *Id.* at 2387 (internal citations omitted); *see also,* COA (COA ¶70, p. 61 at Ex. 3). Given the Court of Appeal's 2022 Judgment indisputably found Trabelsi possesses these symptoms, remand is warranted to provide the medical attention it requests.

## CONCLUSION

For the reasons stated in this Response, and any appearing to this Court, appellant asks this Court to deny appellee's Motion for Summary Affirmance and to allow this appeal to proceed to full briefing. In addition, consistent with the Court of Appeal's 2022 Judgment, and the Minister of Justice's related letter to the U.S. Department of Justice, appellant requests this Court remand proceeding for the limited purpose of obtaining the medical visits it requests including an evaluation of Mr. Trabelsi.

Dated: April 25, 2023.

Respectfully submitted,

/s/ Robin M. Earnest
Robin M. Earnest (D.C. Bar 458304)
*Earnest Attorney at Law, LLC*
7600 Ora Glen, Dr. #241
Greenbelt, MD 20768
(240) 463-4625 (office)
REarnestLaw@gmail.com
www.EarnestAttorneyAtLawLLC.com

*Counsel for Appellant*
*(Appointed by this Court)*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing appellant's

RESPONSE TO APPELLEE'S MOTION FOR SUMMARY

AFFIRMANCE, AND MOTION TO REMAND FOR

MEDICAL EVALUATION was served by ECF to counsel registered to

represent the sole appellee, the United States.

This 25th day of April, 2023.

/s/ Robin M. Earnest
Robin M. Earnest
*Earnest Attorney at Law, LLC*

**CERTIFICATE OF COMPLAINCE**

This Motion has been prepared using Word software, Century

Schoolbook font, 14-point proportional type size and; the body of this

document, exclusive of the case caption, title, and signature block,

contains 3,822 words. I understand that a material misrepresentation

can result in the Court's striking this document and imposing sanctions.

If the Court so requests, I will provide an electronic version of this

document and/or a copy of the word or line print-out.

Dated:__04/25/2023_____        /s/ Robin M. Earnest
                                Robin M. Earnest
                                *Earnest Attorney at Law, LLC*

## INDEX of EXHIBITS

| Exhibit No. | DATE | Exhibit Description |
|---|---|---|
| 1. | 12/13/2022 | 2022 Belgium State Diplomatic Notice |
| 2. | 11/13/2019 | 2019 Belgium State Diplomatic Notice |
| 3. | 09/12/2022 | Judgment of the Brussels Court of Appeals |
| 4. | 12/7/2022 | Belgium Ministry of Justice Letter to U.S. Department of Justice notifying of 2022 Court of Appeals Judgment requesting medical visits. |
| 5. | 02/25/2022 | United Nations Mandates of the Special Rapporteur on torture sent to the United States. |
| 6. | 03/05/2020 | Ministry of Justice Letter to the United States Department of Justice notifying of 2020 Judgment by First Instance (Civil) Court |
| 7. | 03/30/2023 | Letter from Nizar Trabelsi "Let it be Filed" |
| 8. | 04/14/2023 | U.S. District Court Order Denying Motion for Medical Evaluation |

EXHIBIT 1



**KINGDOM OF BELGIUM**

Federal Public Service
**Foreign Affairs,
Foreign Trade and
Development Cooperation**

**our reference**
B1.6/MPL/2022/12601

The Federal Public Service Foreign Affairs, Foreign Trade and Development Cooperation presents its compliments to the Embassy of the United States and has the honour to inform the Embassy of the following.

On September 12, 2022, the Brussels Court of Appeals ordered the Belgian Government to request by diplomatic note the return of Nizar Trabelsi and to discuss the conditions of his return.
The Government of Belgium transmits this Diplomatic Note, with the abovementioned request, in fulfillment of the order.

For your convenience, the said judgment is attached to this note.

The Federal Public Service Foreign Affairs, Foreign Trade and Development Cooperation avails itself of this opportunity to renew to the Embassy of the United States the assurance of its highest consideration.

Done in Brussels on



To the Embassy of
the United States

in Brussels

Attached:
- Arrêt interlocutoire 202/AR/505

Digitally signed by
Jeroen Cooreman
(Signature)
Date: 2022.12.13
09:01:26 +01'00'

 Egmont I · Rue des Petits Carmes 15, 1000 Brussels
Tel. +32 2 501 81 11 · https://diplomatie.belgium.be
Twitter: MFABelgium · Facebook: Diplomatie.belgium · Instagram: BelgiumMFA

**.be**

EXHIBIT 2



Embassy of the Kingdom of Belgium
in **Washington**

3330 Garfield Street NW
Washington, DC 20002
T +1 202 333 6900
F +1 202 338 4960
E-mail: washington@diplobel.fed.be
unitedstates.diplomatie.belgium.be

C1.2/3

The Government of Belgium has the honor to refer to its 23 November 2011 decision to grant the extradition of Nizar Trabelsi for trial in the United States District Court for the District of Columbia on the charges set out in the indictment pending in case no. 06-089.

It has come to the attention of the Ministry of Justice that counsel for Nizar Trabelsi has filed a motion to reconsider motion to dismiss for violation of the Extradition Treaty. The Ministry of Justice has reviewed this motion. The motion is based upon the 8 August 2019 judgment by the Court of Appeal of Brussels. This judgment was notified to the U.S. Justice Department on 9 August 2019.

Trabelsi has filed both an urgent (civil) motion and a civil motion, primarily to halt all (further) cooperation with the United States. The main reason for both motions is that it is alleged that the extradition of Trabelsi was 'illegal', for being in violation with the *ne bis in idem* clause in article 5 of the Treaty. The urgent (summary) motion seeking provisional measures, was denied by the Court of First Instance of Brussels on 23 January 2019. Trabelsi has appealed this decision. On 8 August 2019 the Court of Appeal of Brussels partially reversed this decision by stating that the 'fact based' and not the 'offense based' approach of *ne bis in idem* had to be applied and that therefore the extradition was in violation with the *ne bis in idem* principle. The Court has ordered the judgment to be notified to the United States. The Court did not order to halt all cooperation between Belgium and the United States.

The Belgium Government underlines that the 8 August 2019 judgment is a judgment ordering the above stated notification. The judgment is contrary to the Extradition order of 23 November 2011 and in our view, therefore contrary to the clear wording of article 5 of the Treaty. For this reason, the Belgian Government has appealed the judgment before the Supreme Court (*Cour de Cassation*).

.be

Therefore, the Ministry of Justice confirms, as stated in the diplomatic note no. C1.2/33 of 29 October 2014, the following :

First, the Order, which is the decision by the Belgian government that sets forth the terms of Mr. Trabelsi's extradition to the United States, makes clear that Mr. Trabelsi may be tried on all of the charges set out in that indictment, and that any similarity between the United States case and the Belgian case does not give rise to any bar to his being tried on the charges in that indictment. The Order is also clear that the prosecution may offer facts relating to all 28 overt acts in prosecuting Mr. Trabelsi on the charges in the indictment. Neither Mr. Trabelsi's trial on the charges set out in the indictment, nor the prosecution's offering proof as to any of the overt acts recited in the indictment, is inconsistent with the Order.

In accordance with the Extradition Act, the Minister of Justice has sole authority to decide on a foreign extradition request since extradition is traditionally intergovernmental cooperation. The executive Extradition Order is, consistent with that authority and with the wording and meaning of the Extradition Treaty.

Nor does such trial and offering of proof violate the rule of specialty. The rule of specialty would have been violated if the United States would have added other, different charges to the original four charges for which the extradition was granted, i.e. a fifth, sixth etc. charge, which never happened.

The Embassy of Belgium in Washington D.C. thanks the Department of State for its cooperation in this matter and avails itself of this opportunity to renew to it the assurance of its highest consideration.

Done in Washington D.C. on 13 November 2019

U.S. Department of State
Belgian Desk – Room 5218
Mr. Michael Feldman
2201 C St NW, Washington, DC 20520

U.S. Department of Justice
Attn. Mr. Thomas Saunders





Embassy of the Kingdom of Belgium in
Washington D.C. •

.be

EXHIBIT 3

Copy

Issued to: me. ALAMAT Dounia
art. 792 C.J.
Exempt from court fees - art. 280,2° C.Enr.



*980*

**Expédition**

| Délivrée à | Délivrée à | Délivrée à |
|---|---|---|
| | | |
| le | le | le |
| € | € | € |
| CIV | CIV | CIV |

| Numéro du répertoire |
|---|
| **2022 /** 5988 |

| Date du prononcé |
|---|
| **12 septembre 2022** |

| Numéro du rôle |
|---|
| **2020/AR/508** |

☐ Non communicable au receveur

# Cour d'appel de Bruxelles

# **Arrêt interlocutoire**

1$^{ère}$ chambre F
affaires civiles

| Présenté le |
|---|
| |
| Non enregistrable |
| |

COVER 01-00002881339-0001-0066-01-01-1

 

Court of Appeal Brussels - 2020/AR/508 - p. 2

DUE TO :

TRABELSI Nizar, having made election of residence at the office of his counsel, Maître ALAMAT Dounia in 1000 BRUSSELS, rue Emile Claus 4,

appellant,

represented by Maître MARCHAND Christophe, lawyer in 1060 BRUSSELS, avenue Henri Jaspar 128 and Maître ALAMAT Dounia, lawyer in 1000 BRUSSELS, rue Emile Claus, 4,


against

The BELGIAN STATE, represented by the Minister of Justice, whose offices are located at 1000 Brussels, boulevard de Waterloo, 115

respondent,

represented by Mr. RENSON Bernard, lawyer in 1040 BRUSSELS, Avenue de l'Armée, 10,

---

Having regard to the pleadings and in particular

- the contradictory judgment pronounced on February 26, 2020 by the French-speaking court of first instance of Brussels;

- The appeal petition filed on April 3, 2020 at the court registry for Mr. Nizar TRABELSI;

- the contradictory judgment of July 15, 2020 ruling on the provisional measures requested by the appellant;

- the final additional and summary apDel submissions filed on April 2, 2021 by the appellant;

- additional appeal and summary findings in response filed on July 27, 2021 by State De Age ;

- the exhibits filed with the court.

PAGE    01-00002881339-0002-0066-01-01-4



PLAN

I.          Statement of Facts
It.          Applications currently before the court

          III.          Examination of Mr. Trabelsi's claims

     III.1.          Grievances and damages invoked by the appellant

     III.2.          On the requests relating to the conditions of his detention in Belgium for the   execution
of sentences pronounced by the Belgian courts and the detention undergone with a          view to
extradition

          A.          On the exception of prescription

          B.          On the violation of Article 3 of the ECHR, Article 10 of the Covenant on Civil and Political Rights
                    and Article 417bis of the Criminal Code
          C.          On the absence of an effective remedy

     111.3.          On requests for  injunctions relating to judicial cooperation

          A.          On the main application
          B.          On the alternative claim

     III.4.          On the request to send a diplomatic note

     III.5.          On the claims relating to the appellant's detention in the United States and the consequences of that
detention
          A.          Fault resulting from the violation of the suspension measure ordered by the ECtHR and
                    causal link with the alleged damage

          B.          No statute of limitations and no obstacle resulting from the judgment of the European Court of
                    Human Rights and the resolution of the Committee of Ministers

          C.          Request for repatriation

          D.          Requests related to the caller's health status

          E.          Claims for Violation of Marriage and Continuing Relationships
family

Court of Appeal Brussels - 2........./508 - p. 4

# I.    STATEMENT OF THE FACTS

## 1.1.    Criminal convictions of the appellant in Belgium

1.

The appellant, of Tunisian nationality, was apprehended in Belgium on September 13, 2001. An arrest warrant was issued against him for criminal association, destruction by explosion, possession of weapons of war and membership of a private militia.

The appellant admits the offences of which he is accused and by a judgment of September 30, 2003, the Brussels Correctional Court sentenced him to 10 years' imprisonment - the maximum penalty - and a fine of one thousand euros, for having, among other things, attempted to destroy the Belgian military base of Kleine Brogel by explosion, for forgery and for having been the instigator of a criminal association formed with the aim of attacking persons and property. According to the court, the appellant attempted to commit one of the most serious crimes since the independence of Belgium and despite the time elapsed since his arrest, he has not made amends and his ability to cause harm remains intact.

Specifically, the following preventions are recognized as established:

- Between July 3, 2001 and September 14, 2001, to have tried to destroy the military base of Kleine Brogel, belonging to the Belgian State represented by the Minister of the National Defense, the authors having to presume that there was one or more people there at the time of the explosion;
- Between July 14, 1998 and September 14, 2001, forgery and use of forgeries relating to a French driving license, a Pakistani visa and a Western Union slip;
- Between August 23, 2000 and September 14, 2001, forgery of the seal of the Pakistani State;
- Between May 1, 2001 and October 3, 2001: association of criminals with the aim of attacking people or property, in this case association of people who, in one way or another, favored the project of carrying out a terrorist attack;
- Between July 2, 2001 and September 14, 2001, having received from a foreign person or organization, in any form whatsoever, donations, gifts, loans or other benefits intended to remunerate in Belgium an activity that is likely to undermine the integrity, sovereignty or independence of the Kingdom: in this case, having received a sum of $50,000;
- Between May 8, 2000 and September 14, 2001, having concealed a Pakistani visa;
- Between July 3, 2001 and September 14, 2001, having possessed an ARO machine pistol, a firearm deemed to be a weapon of war, without authorization;
- Between August 23, 2000 and September 14, 2001, having falsified a Tunisian passport;
- On February 8, 2002, to have degraded the walls of the cell 702 of the prison of Forest;

└    ***    ┘

- Between May 3, 2001 and October 14, 2001, having created, assisted or been part of a private militia or any other organization of individuals whose purpose is the use of force;
- Between July 3, 2001 and September 14, 2001, to have entered or stayed in the Kingdom illegally.

By a judgment of June 9, 2004, the Brussels Court of Appeal confirmed the appellant's conviction to ten years imprisonment for various offences, including

*"the attempt to destroy the Belgian military base of Kleine-Brogel by means of an explosion, with the circumstance that the perpetrator must have assumed that one or more persons were present at the time of the explosion (...),*

*exercised a command quelConque within an association formed with the aim of perpetrating crimes carrying the penalty of life imprisonment and, in this case, to carry out a terrorist attack (...),*

*- received from a foreign organization funds intended to carry out in Belgium an activity likely to undermine the internal security of the State (...),*

*- illegally held a weapon of war (...),*

*created, assisted or participated in a private militia or any other organization of individuals whose purpose is to use force (...)".*

The appellant appealed to the Court of Cassation, which dismissed the appeal in a decision dated November 3, 2004 (No. P.04.1191.F).

2.

The primary sentence was completed on September 13, 2011. A second and third subsidiary sentence of imprisonment of six[1] and three months, however, are imposed on the appellant in 2007 and directly executed so that he completes his sentences on June 23, 2012.

3.

From June 24, 2012 until Oct. 3, 2013, the appellant was deprived of his liberty for the purpose of his surrender to the U.S. authorities, who requested and obtained his extradition, under the circumstances recounted below.

---

On April 16, 2007, the Court of Appeal of Liège convicted him of death threats and assault against the director of the prison of Lantin, in a state of legal recidivism.



Court of Appeal Brussels - 2020/AR/508 - p. 6

He files several motions for release, all of which are denied.

       1.2.    International arrest warrant, exequatur and extradition proceedings

4.

A first indictment was handed down on April 29, 2005 by the District Court of Columbia grand jury, based on four counts that listed 21 "overt acts" or predicate facts, including

*"16) during or around* July *2001, in Uccle, Brussels, Belgium, Nizar Trabelsi*
o rented *an apartment,*

*17) during or around the months of July and August 2001, in Belgium,* /V/Zoë *Trabelsi bought large quantities of chemical products, (...) in order to use them to make a 1000 kg bomb;*

*18) During or around August 2021,* /V/d'or *Trabelsi traveled at night with other conspirators to explore the U.S. air base at Kleine Brogel, a facility used by the U.S. and the U.S. Department of the Air Force, in which U.S. citizens were located, as a target for a suicide bombing;*

*19) during or around the beginning of September 2001, near Brussels, Belgium,*
*/\//Trobelsi moved a large quantity of chemicals, (...), from his apartment to a restaurant run by a known conspirator of the*
*Grand Jury, after police searched his apartment for a seemingly innocuous reason;*

*20) on or about September 14, 2001, Nizar Trabelsi, having been arrested, falsely denied to the Belgian authorities that he knew the meaning of the list of chemicals listed in* the *soccer team's book or that he had intended to make or explode a bomb.*

A new indictment was drawn up on November 3, 2006, with four charges:

- criminal conspiracy to murder U.S. citizens outside the United States;
- criminal association and attempted use of weapons of mass destruction ;
- criminal association to provide material support and resources to a foreign terrorist organization;
- providing material support and resources to a foreign terrorist organization.

PAGE    01-00002881339-0006-0066-01-01-4



The general allegations are in substance that appellant was persuaded during 2000 to travel to Afghanistan, via Pakistan, and that he engaged in a conspiracy with others known and unknown to the Grand Jury for the purpose of destroying, by terrorist means, American persons, property, and interests, wherever located but outside the United States, in accordance with the operational mode of al-Qa'ida, which is to assign such missions to operational cells, by terrorist means, American persons, property and interests, wherever they may be, but outside the United States, in accordance with the operational mode of Al-Qaeda, which is to entrust such missions to operational cells on targets chosen by the leadership of A!-Qaeda leadership and changed according to circumstances.

The indictment lists 28 "stated acts" as the primary factual elements on which the charges are based. The first 22 relate to the appellant's travel to Afghanistan, his contacts, his military training, and his modes of travel, until his return to Belgium. The "stated acts" 23 through 26 are as follows:

" *23. Around July 2001, in Uccle, Brussels,* N/zoe *Trabelsi rented an apartment;*

*24. Around July and August 2001, in Belgium, Nizar Trabelsi purchased quantities of chemicals including acetone, sulfur, nitrate and glycerine to be used in the manufacture of a one-ton bomb;*

*25.  Around August in Belgium, Nizar Trabelsi went on a night scouting trip with other criminals to the Kleine Brogel military airbase - an infrastructure used by the United States and the United States Air Force Department where American citizens were present - as a target for a suicide bombing;*

*26. Around the beginning of September 2001, on the outskirts of Brussels, Belgium, Nizar Trabelsi o moved and had moved quantities of chemicals, including acetone and sulfur from Trabelsi's apartment to a restaurant run by a criminal known to the Grand Jury after the police had visited the apartment for seemingly innocent purposes.*

5.

On November 16, 2007, an international arrest warrant for the purpose of extradition was issued against the appellant by Mr. Alan Kay, US States Magistrate Judge, District Court for the District of Columbia (U.S.A.), pursuant to the Extradition Convention concluded between the Kingdom of Belgium and the United States of America on April 27, 1987; this warrant was based on the indictment of November 3, 2006.

6.

On April 8, 2008, the U.S. authorities forwarded to the Belgian authorities a request for the extradition of the appellant, pursuant to the bilateral extradition agreement of April 27, 1987 between the Kingdom of Belgium and the United States of America.

This extradition request is motivated by reference to the indictment and is accompanied by an *affidavit* drawn up by an FBI agent in March 2008 which relates the facts and the evidence already collected linking the appellant to Al-Daeda and other members of this organization, such as Richard Reid, who is sentenced to life imprisonment in the USA.

7.

In a diplomatic note no. 38 of November 12, 2008, the U.S. authorities indicate that the extradition request is from the (federal) District of Columbia Court, that the purpose of the extradition is to prosecute the appellant in accordance with the ordinary criminal law of the United States of America, that he will therefore not be prosecuted in a special court, and that after his extradition, he will not be detained or incarcerated in a non-civilian prison.

According to the excerpts of the criminal law (Title 18 of the United States Code, U.S.C.) transmitted by the U.S. authorities, the first two counts are punishable *by indefinite or life imprisonment, or by both a fine and imprisonment.*

8.

On June 4, 2008, the Federal Prosecutor filed a request with the Council Chamber of the Court of First Instance of Nivelles to enforce the arrest warrant issued `on November 16, 2007 against the appellant,` *except for the acts declared 23 to 26.*

By an order of November 19, 2008, the Council Chamber of the Court of First Instance of Nivelles granted the exequatur "*except insofar as it refers to the 'overt acts' n°s 23, 24, 25 and 26 set out in paragraph 10 of the indictment and supposedly repeated in support of the three other counts*" because "*the examination of the documents attached to the arrest warrant issued for the purposes of extradition (....] reveals, for its part, that among the 'overt acts' that the American authorities detail in support of the first count of the indictment, there are several that correspond very precisely to the facts, committed on Belgian soil, which form the basis for the conviction* (of the appellant) *in Belgium.*
*(...)*
*Under the ne bis in idem principle, the extradition warrant issued on November 16, 2007, by the competent judicial authority of the United States of America cannot be used as a basis for the prosecution of the accused.*



*therefore be given effect insofar as it relates to the 'declared acts' Nos. 23, 24, 25, 26 set forth in paragraph 10 of count one and purported to be repeated in support of the other counts.*

9.

On February 19, 2009, upon appeal by the appellant who totally contests the exequatur, the Indictment Division of the Brussels Court of Appeal confirms the order on the contrary opinion of the Federal Prosecutor who requires this time the exequatur for *all the declared acts* and this, by *erroneously* indicating *in* a *supplementary indictment* of February 4, 2009 that the maximum sentences incurred by the appellant are 15 years and 10 years respectively, *"which cannot be considered, with regard to the offences charged, as being of exceptional length"*, nor incompatible with article 3 of the ECHR Convention as interpreted by the ECHR Court. As will be seen below, the appellant faces life imprisonment for two of the four declared acts.

The appellant appealed against the judgment; the appeal was rejected by a judgment of the Court of Cassation of June 24, 2009.

The exequatur is therefore definitively granted to the international arrest warrant, with the exception of the acts declared 23 to 26.

10.

The extradition procedure then begins, requiring an opinion from the Indictment Division, which must examine, among other things, whether the proposed extradition complies with the Law of March 15, 1874 on extraditions, article 4, paragraph 2 of which states

> *"Extradition may not be granted if there is a serious risk that the person, if extradited, would be subjected in the requesting State to a flagrant denial of justice, to torture or to inhuman and degrading treatment".*

The federal prosecutor then asked the U.S. authorities about the penalties that the appellant could face if convicted of the charges against him.

In a diplomatic note on November 11, 2009, the U.S. Department of Justice responded that "*for sentencing purposes, the court may take into account the seriousness of the facts, taking into account the loss of life or destruction of property,*" that "*in this case Trabelsi has not succeeded in carrying out his plans to assassinate U.S. citizens and to use weapons of mass destruction. Therefore, the court could find that Trabelsi failed to carry out his plans in sentencing. The court may also invoke mitigating circumstances, such as the fact that the convicted person recognizes that he is responsible for his actions.* The letter adds that in case of a life sentence, "*Trabelsi can address to the President an appeal in grace or in*



*However, in the case of Trobelsi, this is a purely theoretical possibility. We are not aware of any case where a convicted terrorist has managed to obtain a presidential pardon or commutation of his sentence.*

**11.**

On December 23, 2009, without waiting for t h e  outcome of the extradition procedure, the appellant filed an application before the European Court of Human Rights in order to have the Court find that *"the extradition procedure to which he is subject constitutes a violation of Articles 3, 6 and 14 of the Convention, in particular because of the flagrant denial of justice, the acts of torture and inhuman and degrading treatment that he is at risk of undergoing in the United States of America and in Tunisia".*

**12.**

The extradition procedure is nevertheless continuing.

In a statement of claim dated February 4, 2010, the Federal Prosecutor's Office asked the Brussels Indictment Division to give a positive opinion on the extradition request, except for the declared facts that were excluded from the exequatur.

The Federal Prosecutor's Office must acknowledge that, for the first two counts, the appellant faces a sentence of life imprisonment, contrary to what he had indicated to the Indictment Division during the exequatur proceedings (see no. 9).

**13.**

On June 10, 2010, the Indictment Division of Brussels, which is better informed of the actual sentences incurred by the appellant, cannot question the exequatur of the arrest warrant. It issues the following opinion regarding his extradition

> *"Extradition* cannot be *granted:*
>
> *- On condition that the death penalty is not imposed on N. TRABELSI or, if this condition cannot be met by the United States, on condition that the death penalty is not carried out;*
>
> *- Provided that the life sentence may be commuted, even if the conviction is for terrorism.*
>
> *In the event of a request for re-extradition of TRABELSI to a third country, in particular to Tunisia, the United States shall seek the prior consent of the United States in the event that the request is denied,*



*N. TRABELSI having been handed over to them, they would be confronted in the future with an extradition request that Tunisia will have addressed to them in the meantime.*

*If the US does not accept these conditions, extradition should be refused.*

14.

However, the U.S. authorities confirmed in a new diplomatic note dated August 10, 2010, that if a life sentence is imposed on the appellant, it would only be possible for him to obtain a presidential pardon, pursuant to Article 2.H. of the U.S. Constitution, or a reduction of sentence if he provides substantial assistance in the prosecution of a third party or if he is in a serious humanitarian situation. The conditions set by the House of Impeachment will never be met.

15.

Nevertheless, on November 23, 2011, the Minister of Justice signs the ministerial decree granting the United States government the extradition of the appellant after the appellant has satisfied the Belgian justice system.

With respect to the possible application of a life sentence, the Minister believes that

*Although since 2001 individuals have been sentenced to life without parole ... for terrorism or terrorism-related offenses, the substance of these cases cannot be compared to the Trabelsi case. All of the individuals sentenced in the United States to life without parole or early release were charged, prosecuted, and ultimately convicted for their involvement as participants in terrorist attacks that resulted in death and/or injury and significant property damage, such as the attacks on the U.S. embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania, on August 7, 1998....*

*These offences are clearly not comparable to those charged against the person claimed in terms of their significance and nature.*

*In the above cases, people, sometimes in very large numbers, in addition to U.S. nationals, did suffer substantial physical and material damage. In contrast, the Claimant is being prosecuted for premeditating and preparing a terrorist attack that was not carried out. The person claimed did not succeed, with others, in causing human or even material damage.*



*It is doriC fTlCinifully plausible that the charged offenses would not allow for the imposition or imposition of the maximum sentence under the applicable U.S. penal code, namely, a non-compressible life sentence."*

As for the *ne bis in idem* principle, the Minister does not respect the exclusion of the acts declared 23 to 26 from the exequatur, on the grounds that the *ne bis idem* principle is not applicable but the principle of *double jeopardy:*

*"In contrast to the principle of ne bis in idem, the principle of double jeopardy set out in Article 5 of the Extradition Convention is limited to the same offences or to offences which are* substantially *the same. This concept excludes the (same) evidence, the (same) proof or the same material statement of facts which were, where applicable, used to prove the offences for which the person was previously prosecuted, convicted or acquitted. Insofar as these factual and/or evidentiary elements are identical or substantially identical, a second prosecution is prohibited (...)*

*In other words, it is not the facts but the qualification of these facts, the offences, that must be identical.*

The appellant was served with this order on December 6, 2011.


16.

On the same day, the appellant applied to the European Court of Human Rights for an interim measure to suspend his extradition. By judgment of the same day, the suspension was ordered.

On December 20, 2011, the Belgian State requests the lifting of this measure but by decision of January 12, 2012, the Court of Human Rights maintains it.

On January 15, 2013, in response to a third request for lifting, the ECtHR decided to maintain the provisional measure, specifying that it was for the duration of the proceedings before it.

In response to a fourth request by the Government to lift, the Court reiterates, by letter dated June 18, 2013, that the interim measure is maintained until the conclusion of the proceedings before it.

On July 10, 2013, the ECtHR informed Tes parties that the examination of the case was adjourned to take into account the impending judgment of the Council of State (see below) and the judgment of the Grand Chamber in Vinter and Others v. United Kingdom.



When asked by the Government about the time frame for the case, the ECtHR informed it on 25 September 2013 that the examination of the case would take place in late October or early November 2013.

17.

In the meantime, on February 6, 2012, the appellant filed an annulment appeal against the ministerial extradition order before the Council of State. In particular, he alleges violation of Article 5 of the 1987 Bilateral Extradition Convention, Article 4 of Protocol No. 7 to the ECHR, and Article 14, §7, of the International Covenant on Civil and Political Rights, even taking into account the exclusion of "declared acts" 23 to 26.*

The Council of State's rejection decision came on <u>September 23, 2013</u>. Comparing the charges for which Mr. TRABELSI was convicted in Belgium and the "declared acts" for which extradition was granted, the Council of State considered that all of the "declared acts had no *territorial link with the Kingdom of Belgium and constituted a set of facts that served as elements of the four charges retained by the American authorities*. He deduced that Mr. TRABELSI was being claimed for offenses for which he had not been found guilty, convicted or acquitted in Belgium and that the acts declared constituted elements that would be used by the American judicial authorities to establish whether or not Mr. TRABELSI was guilty of the four charges brought against him (judgment no. 224.770).

However, in the list of declared acts that it takes into consideration, the State Council does not mention the declared acts n° 23 to 26 for which the exequatur was not granted, whereas the ministerial decree mentions them...

18.

On October 3, 2013, the Belgian government extradited the appellant to the United States and turned him over to U.S. authorities, who detained him at Rappahannock Prison in Stafford, Virginia.

19.

<u>On February 6, 2014</u>, the Belgian authorities received a request for judicial cooperation from the US Department of Justice.

---

[2] He criticizes the Belgian judges who granted the exequatur to the international arrest w a r r a n t  for having considered that only the acts declared 23 to 26 are the basis for his conviction in Belgium and he argues that the investigation conducted in Belgium covered all the acts declared in the extradition request.



20.

By judgment of 4 September 2014, the ECtHR ruled on the appeal lodged by the appellant in 2009, decided that the Belgian State had violated Articles 3 and 34 of the ECtHR and ordered the Belgian State to pay the appellant the sums of

*- 60.000€ (...) for moral damage suffered because of his extraditlon;*
*- 30.000€(...) for costs and expenses".*

On the other hand, the Court rejected the complaints of violation of articles 6, §1, and 8 of the ECHR and 4 of Protocol No. 7 (see below).

21.

In November 2018, the Belgian authorities submitted a revised assessment to the Committee of Ministers of the Council of Europe. The Committee of Ministers, which is responsible under Article 46 of the ECHR[3] for supervising the execution of this judgment, adopted a resolution on 6 December 2018, according to which the Belgian State "has *taken all measures that can be expected to avoid or reduce, as far as possible, the risk of an unconditional life sentence for the appellant, in view of the guarantees they have obtained from the American authorities and their commitment to intervene, at the appropriate time, on the issue of the sentence by an amicus curiae*, and in view of the revised report in which the Belgian government describes the measures it has adopted to execute the Court's judgment and the guarantees it has obtained from the American authorities

        if the appellant is convicted of all or part of the charges, he could, directly before sentencing, either ask the judge to set aside the jury's verdict on all or part of the charges and enter an acquittal, or ask the court to order a new trial. An acquittal by the judge would extinguish the Government's ability to prosecute him on the relevant counts;

        as to the sentence itself, the Court can only impose a sentence for charges for which the appellant would be found guilty. The Court has the power to

---

*According to Article 46 of the ECHR "Binding force and execution of judgments*
*" 1. The High Contracting Parties undertake to abide by the final judgments of the Court in disputes to which they* are *parties.*
*2. The final judgment of the Court is transmitted to the Committee of Ministers which supervises its execution.*
*3. (...)*
*4. Where the Committee of Ministers considers that a High Contracting Party refuses to comply with a final judgment in a case to which it is a party, it may, after giving notice to that party and by decision* by a two-thirds majority vote of the representatives entitled to sit on the Committee, refer to the Court the question of that Party's compliance with its obligation under paragraph 1.
*5. If the Court finds that there has been a violation of paragraph 1, it shall refer the case to the Committee of Ministers for consideration of the measures to be taken. If the Court finds that there has been no violation of* paragraph 1, it shall refer the case to the Committee of Ministers, which shall decide to close its examination.



discretionary sentencing. This may result in the imposition of the maximum sentence, despite the absence of a request from the Attorney General, but it may also result in a sentence that is less than that provided for in the United States Sentencing Guidelines, which set out the calculation of sentences for different offences;

the Belgian government has undertaken to make use, at the appropriate time, of its possibility to intervene as *amicus curiae* on the issue of the sentence during the trial which will begin in September 2019;

In the event of Mr. Trabeli's conviction, there are many avenues of appeal available to him. Thus, the Court of Appeal may consider either that the jury was not in possession of all the evidence necessary to decide on the guilt, or that an error of law was committed: it would then send the case back to the first instance, to pronounce the acquittal or else for a new trial. Alternatively, upon appeal by the applicant, the Court may find that the sentence is unreasonable and remand the case to the trial court for imposition of a lesser sentence. If these appeals are denied, the petitioner may seek a review of the decision by other or more judges. The granting of such reviews is, however, at the discretion of the Court;

the Supreme Court will be able to review the decisions of the Court of Appeals on legal issues (constitutional law or federal criminal procedure). Finally, an extraordinary remedy exists for all prisoners in custody for all federal offences.

### 1.3. The summary proceedings conducted before the Belgian courts by the appellant after his extradition

22.

After his extradition to the United States, the appellant repeatedly brought summary proceedings before the Belgian courts, essentially in order not to be prosecuted in the United States, or at least not to be prosecuted and convicted there for the acts for which he was convicted in Belgium. He also seeks to obtain the absence of any international cooperation.

This Court shall rule in summary proceedings, primo *facie,* on the apparent violation of the principles
*ne bis in idem,* speciality of extradition and res judicata. Thus

By a first judgment of August 8, 2019, the Court ordered the Belgian State to notify the American authorities of the said judgment, inviting them to take cognizance of the legal analysis contained in paragraphs 37 and following, according to which

- Article 5 of the Extradition C o n v e n t i o n  refers to the identity of the fact and not the identity of the qualification;

Court of Appeal Brussels - 2023/508 - p. 16

- the Belgian courts - order of the Nivelles Council Chamber of November 19, 2008, confirmed by the decision of the Indictment Chamber of the Brussels Court of Appeal of February 19, 2009 - limited the exequatur given to the American arrest warrant by granting it "except insofar as it concerns the 'Overt Acts' n° 23, 24, 25 and 26 set out in paragraph 10 of the first charge and supposedly repeated in support of the three other charges";

- These decisions of the Belgian courts are res judicata and are binding on the Belgian State;

- the ministerial extradition order of November 23, 2011 could only validly grant the extradition requested by the United States within the limits of the exequatur given to the arrest warrant, i.e., for the four counts of the arrest warrant, but without being able to refer to the "Overt Acts" Nos. 23, 24, 25, and 26 set forth in paragraph 10 of Count 1 and supposedly repeated in support of the other three counts;

by a judgment of May 23, 2022, based on article 19, paragraph 3 of the Judicial Code, the court again enjoins the Belgian State to communicate this judgment, in which it is stated that the court notes *firstly* that

- Mr. TRABELSI was extradited in violation of Article 3 of the ECHR and in violation of a provisional measure ordered by the ECHR Court;

- the Minister of Justice persistently disregards the Belgian Law of 1874 on extradition and the res judicata effect of judicial decisions that are nevertheless binding on him;

- no reasonable and lawful justification is prima *facie* likely to justify such violations and the exceptional situation in which they have placed Mr. TRABELSI.


### 1.4.    Appeals filed in the USA against the indictment

23.

In the U.S. courts, the appellant filed several motions to dismiss the entire indictment. All of these motions were denied.

On the other hand, the request of the Columbia State Attorney to withdraw charges C and D from the indictment is granted.

The appellant is currently still being prosecuted on charges A and B for which he faces a life sentence.




I.S.     Relationship between the appellant and Ms. Berrou

24.

The appellant and Ms. Berrou had a relationship that will be clarified by the court in the Discussion.

It.     CLAIMS CURRENTLY BEFORE THE COURT

25.

The procedural background is set out in the judgment of July 15, 2020, to which the court refers.

It is recalled that by summons of October 3, 2018, the appellant requested the first judge (i) to order injunctive relief and to order the BELGIAN STATE to award him *ex aequo et bono* the following compensation:

- Primarily, 75.000 € and, in the alternative, 23.000 € for the damage caused by the degrading detention in Belgium;
- 72.000 € for the damage caused by the degrading detention in the United States;
- 1€ provisional, on an amount not currently assessable, for the future holding in the United States ;
- 1€ provisional, on an amount not currently assessable, in relation to the costs of medical expenses required by the applicant;
- 1 provisional, on an amount not currently assessable, for the costs of expenses necessary to maintain the applicant's family relations,
  -1.500 € for the moral damage caused by the violation of the right to marriage and family life of the plaintiff.

It also requested, before the law, in case its requests were not met, to order the Belgian State to produce documents on the basis of articles 735, 19 and 871 of the Judicial Code, namely:

- *any document in the possession of the Ministry of Justice, relating to the extradition of Mr. TRABELSI requested by the United States, that is to say, all the administrative file, with the exception of the prison file, existing in his regard for the period from September 2001 to March 2008;*



- *all the correspondence exchanged with the United States, and even the reports of meetings between agents of the two States, concerning the extradition of Mr. TRABELSI, for the period from September 2001 to March 2008,*
- *the general inventory as well as the inventories of each box and each sub-folder of the criminal file that led to the conviction of Mr. TRABELSI, in order to demonstrate that the elements coming from other European countries, included in the "Discovery Status Order" of June 22, 2018, are issued from the international letters rogatory executed in the framework of the Belgian investigation;*
- *all documents, exchanges of correspondence and all information concerning the organization of the extradition of Mr. TRABELSI which took place on October 3*

- *And this, under penalty of a fine of 500 € per day of delay, from the date of service of the judgment to intervene ".*


The Belgian State asked the first judge to

*"To declare itself without jurisdiction to hear the action of Mr. TRABELSI*
*In the alternative, declare the Plaintiff's oCtlOFl inadmissible as time-barred, or in any event unfounded;*
*To dismiss the applicant and to order him to pay the costs of the proceedings including the procedural indemnity which can be fixed at the basic procedural indemnity of EUR 90.00.*


26.

First Judge:

-dismisses the objection to jurisdiction raised by the Belgian State and rules that the Tribunal may hear all the claims made by the appellant;

- declares all the claims admissible, with the exception of claim 8, which seeks an order that the Belgian State pay the claimant compensation "as a principal sum, of 75,000 and, in the alternative, €23,000 for the damage caused by the degrading detention in Belgium", its admissibility still having to be examined (statute of limitations) and orders the reopening of the proceedings so that the parties can enlighten the Tribunal more precisely on this request;

- rules that the reopening of the proceedings also extends to claims 5, 6, 7, 11 and 13, i.e. those in which the appellant requests
  to enjoin the Belgian State to organize a monitoring of the health situation of Mr. TRABELSI, via the Belgian consular services in the United States and by sending a psychiatrist in order to ensure the follow-up necessary by the situation of the



and any other specialist that Mr. TRABELSI may need;

➢ to enjoin the Belgian State to request the authorizations of visit for the consular authorities and the doctors referred to above within eight days of the judgment, under penalty of a fine of 5.000 EUR per day of delay;

➢ to enjoin at least the Belgian State to intervene, as far as it can, with the American administration, in order to preserve the physical and psychological integrity of the applicant; in this context, to duly draw the attention of the American authorities to the precarious state of health of the applicant, at the time of his extradition, to the recommendations formulated by the Belgian doctors concerning the need to alleviate the applicant's isolation, and to his needs in terms of psychological, medicinal, and medical follow-up ,

➢ to order the BELGIAN STATE to pay one euro provisional for the costs of the medical expenses incurred by the appellant;

➢ to order the BELGIAN STATE to pay compensation of 1,500 euros for the moral damage caused by the violation of the appellant's right to marriage and family life.

- dismisses claims 1, 2, 4, 9, 10, 12 and 15 to 18 as unfounded, that is, the claims by which the appellant seeks

➢ to enjoin the BELGIAN STATE to cease any type of cooperation with the American authorities with a view to the judgment of the appellant, under penalty of a fine of 5,000 euros per day from the date of service of the judgment to intervene, and to withdraw the authorization/prohibit all of its agents better identified in exhibits XV.2. and XV.3. from testifying in the United States ,

➢ to enjoin the BELGIAN STATE to inform the American authorities within two days of the service of the judgment to intervene that the proceedings against the appellant violate the principle of non *bis* in *idem,* under penalty of a fine of 5,000 euros per day of delay; to

➢ enjoin          à the BELGIAN    BELGIAN STATE      to carry out      all        the
                                     steps        useful  in order to     allow/facilitate the return of the caller to
Belgium;

➢ to order the BELGIAN STATE to pay compensation of 72,000 euros for the damage caused by his degrading detention in the United States;

➢ to order the BELGIAN STATE to pay a provisional euro, on an amount that cannot be evaluated at this time, for the future detention in the United States;

➢ to order the BELGIAN STATE to produce all documents, in the possession of the Ministry of Justice, relating to the extradition of Mr. TRABELSI requested by the United States, that is to say all the administrative files, with the exception of the prison file, existing with regard to him for the period running from September 2001 to March 2008; all the correspondence exchanged with the United States, and even the reports of meetings between agents of the two States, concerning the extradition of Mr. TRABELSI, for the period from September 2001 to March 2008; the general inventory as well as the inventories of each box and each sub-folder of the criminal file that led to the conviction of Mr. TRABELSI; and the documents relating to the extradition of Mr. TRABELSI.

TRABELSI, in order to demonstrate that the elements coming from other European countries, included in the "Discovery Status Order" of June 22, 2018, are derived from the international letters rogatory executed within the framework of the Belgian investigation; all documents, exchanges of correspondence as well as all information concerning the organization of the extradition of Mr. TRABELSI having taken place on October 3, 2013; and this, under penalty of a fine of 500 € per day of delay, as of the service of the judgment to intervene.

Finally, the first judge ordered the Belgian State to notify a copy of the judgment through official channels to the competent American authorities, stating in the accompanying letter

*"According to the analysis that prevails in Belgian law, the extradition of Mr. TRABELSI does not allow him to be prosecuted in the United States for the facts set forth in the "Overt Acts" n° 23, 24, 25 and 26 set forth in paragraph 10 of Count 1 and allegedly repeated in support of the remaining counts [of the U.S. arrest warrant that is the basis for the extradition (Grand Jury Indictment of November 3, 2006, filed November 16, 2007 with the Clerk of the U.S, District Court for the District of Columbia)), namely the facts related to the attempted attack on the Kleine Brogel military base.*

*Except for the words in italics and square brackets, This conclusion is the one contained in paragraph 41 of the August 8, 2019, judgment of the Brussels Court of Appeal, sitting in rëfërë, which was transmitted by the Belgian authorities to the U.S. Department of Justice on August 9, 2019.*

*The French-speaking Court of First Instance of Brussels comes to the same conclusion for the reasons set out in the judgment on the merits annexed hereto (see in particular points 123 to 135 of that judgment);*

27.

Following the court's July 15, 2020 ruling on the urgent and interim relief sought by appellant, the parties file new pleadings.

In his final submissions, the appellant requests

*"As a principal,*

*To enjoin the Belgian State to cease any type of cooperation with the American authorities for the prosecution and judgment of Mr. TRABELSI, under penalty of a fine of 10,000 € per day from the date of service of the judgment to intervene, with a ceiling of 500,000 €;*

*Specifically:*



o      *refuse to grant authorization to execute any new request for international assistance in this case;*

o      *prohibit members of the criminal justice system from assisting U.S. prosecutorial authorities, through formal or informal communications;*

o      *withdraw the authorization granted to "its agents", in the context of the request for American international judicial assistance and enjoin all "its agents", better identified in Exhibit VI.d.4 (investigating judge, judicial police officers, etc.), to testify in the United States as agents of the Belgian State;*

*At the very least, to enjoin t h e  Belgian State to notify the judgment to be delivered to each of these persons, identified within the framework of international cooperation and called to testify in the United States, and to invite them to take due note of it, especially with regard to the paragraphs relating to the request for cessation of international cooperation, the violation of res judicata, t h e  violation of the non bis in idem principle and the violation of the principle of speciality of extradition;*

*To enjoin the Belgian State, represented in the present case by its Minister of Justice, the only representative of the Belgian State recognized in the international relations maintained by Belgium, to send a diplomatic note to the American authorities, within two days of the service of the judgment to intervene, indicating that t h e  exequatur of the warrant of arrest of Mr. TRABELSI was refused for the "over acts" 23 to 26, on the basis of article 5 of the bilateral Convention of extradition of April 27, 1987 between the kingdom of Belgium and the United States of America; that this limitation of extradition is an integral part of t h e  Ministerial Extradition Order of November 23, 2011; that Article 5 of the Bilateral Extradition Convention, concerning the principle of non bis in idem, refers to an "identity of fact" and not to an "identity of offence"; that consequently, it would be contrary to the principle of speciality, provided for in Article 15 of the Bilateral Extradition Convention, to prosecute Mr. TRABELSI for the*
*The "over acts" 23 to 26, i.e. the facts relating to the attempted attack w i t h  explosives on the military base of Kleine Brogel;*

*To attach to the above-mentioned injunction a penalty of €10,000 per day of delay with a ceiling of €500,000;*

*Prohibit the Belgian State from distancing itself, in any way, in its official communications, from what has become res judicata and is not contested by it within the framework of the present proceedings, whether by sending several successive diplomatic notes, by using quotation marks or by "informing" the United States of the introduction of an appeal in cassation, under penalty of a fine of 500,000 €;*

*To enjoin t h e  Belgian State to carry out all the useful steps in order to allow/facilitate the return of Mr. TRABELSI to Belgium (delivery of a laissez-passer, OFIiSOtlOFI of the return whatever the conditions imposed by the United States, financial coverage of the* return, *etc.) ,*



Court of AppealBruxeles-2020/AR/508- p. 22

*In the meantime, or in the event that it is impossible to return Mr. TRABELSI to Belgium, the Belgian State should organize a monitoring of his health situation through the Belgian consular services in the United States and/or send a psychiatrist to ensure the follow-up necessary for the situation of the appellant and any other specialist that Mr. TRABELSI may require;*

*To enjoin the Belgian State to request the authorizations of visit for the consular authorities and/or the doctors referred to above within eight days of the judgment to intervene, under penalty of a fine of 5.000 € per day of delay, with a ceiling of 500.000€,*

*To enjoin at least the Belgian State to send an amicus curiae to the American authorities, relaying the concerns formulated by the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment and the Special Rapporteur on the promotion and protection of human rights and fundamental freedoms while countering terrorism, duly drawing the attention of the American authorities to the precarious state of health of the appellant at the time of his extradition the evolution of his conditions of detention in Belgium, the exact conditions of his detention at the time of his extradition, the various reasons that justified the extension of his isolation in Belgium, the recommendations made by Belgian doctors concluding that it was necessary to reduce the isolation of the appellant, as well as the psychological, medicinal and medical follow-up that he was receiving at the time of his extradition*

*Order the Belgian State to pay the Appellant the following compensation, assessed on a pro rata basis*

aequo and bono.

o    *For the arbitrary detention, 52.000 € and to condemn the Belgian State to compensatory interest from July fer 2012,*

*In the alternative, €38,000 or, at the very least, €25,000* and *order the Belgian State to pay compensatory interest from November 1, 2014 or February 1, 2017 respectively;*

*In the infinitely alternative, € 25,000, as loss of chariCe to obtain his release and order the Belgian State to compensatory interest from November iron 2014 ;*

o    *For the moral damage caused by the degrading detention in Belgium,*

*As priCÎQal, 75.OOO C, and order the Belgian State to pay compensatory interest as of June 2007;*

*In the alternative, 23.000 € and order the Belgian State to pay compensatory interest as of November 2011;*

o    *103,500 for the damage caused by the degrading detention in the United States and order the Belgian State to pay compensatory interest from October 2013;*

o    *1 € provisional, on an* amount not *currently assessable, for future detention* in the *United States,*



o      *1 € provisional, on an amount not currently assessable, in relation to the costs medical expenses incurred by the appellant;*

o      *1 € provisional, on an amount not currently assessable, in relation to the permanent disability deriving from the arbitrary, inhuman and degrading detention of the appellant;*

o      *1 provisional, on an amount not currently assessable, for the costs of expenses necessary to maintain the appellant's family relationships;*

o      *1.500 € for the moral damage caused by the violation of the appellant's right to marriage and family life and order the Belgian State to pay compensatory interest from October 3, 2013;*

*Order the Belgian State to pay interest on each of the amounts awarded by the judgment;*

*Order the Belgian State to pay all costs and expenses of the proceedings, including the procedural indemnity (€12,000) for each of the proceedings.*


*In the alternative,*

*Before the law, on the basis of articles 19, 871, 877 and 1066 of the Judicial Code, order the Belgian State to, within fifteen days of the notification of the judgment to intervene,*

*Produce all documents in the possession of the Ministry of Justice and the Federal Prosecutor's Office that are not in the possession of the appellant in the context of the judicial appeals that he has filed, relating to his extradition to the United States, for the period from September 2001 to mid-2008;*

*Produce exchanges with U.S. authorities between 2008 and 2013;*

*Produce all the documents, exchanges of correspondence and all the information concerning the actual extradition of Mr. TRABELSI that took place on October 3, 2013;*

*Produce all exchanges between the U.S. and Belgian authorities relating to this case, subsequent to the appellant's extradition;*

*Produce all the international letters rogatory sent by the United States to Belgium in this case as well as their execution documents;*

*And this, under penalty of a fine of 1.000 € per day of delay, from the fifteenth day following the notification of the judgment to intervene, with a ceiling of 50.000 € '.*



28.

The Belgian State asks the court to

> to declare itself without jurisdiction to hear the action of Mr. TRABELSI;

> in the alternative, declare Mr. TRABELSI's action inadmissible or in any event unfounded;

> order Mr. TRABELSI to pay the costs.

### III.    EXAMINATION OF THE REQUESTS MADE BY MR. TRABELSI

#### III.1.    Grievances and damages invoked by the appellant

29.

Invoking articles 1382 et seq. of the Civil Code, the appellant considers that the Belgian State has committed several breaches with regard to him. The appellant formulates the following grievances:

> iors of his detention in Belgium, violation of articles 3, 8 and 12 of the ECHR, article 10 of the International Covenant on Civil and Political Rights, articles 471bis and following of the Penal Code, the principle of legality before the adoption of the Law of Principles[4] and

---

[4] Article 3 of the Convention
*' No one shall be subjected to torture or to inhuman or degrading treatment or punishment."*

*Article 8 of the Convention*
*"Everyone has the right to respect for his private and family life, his home and his correspondence.*
*2. There shall be no interference by a public authority with the exercise of this right except such as is in accordance with the law and is necessary in a democratic society in the interests of national security, public safety or the economic well-being of the country, for the prevention of disorder or crime, for the protection of health or morals or for the protection of*
*rights and freedoms of others.*" .

*Article 10 of the International Covenant on Civil and Political Rights*
*1.*
*All persons deprived of their liberty are treated with humanity and with respect for the inherent dignity of the human person.*
*2.*
*a) Accused persons shall, except in exceptional circumstances, be separated from convicted persons and shall be subject to a separate regime, appropriate to their condition as unconvicted persons.*
*b)*
*The accused youths are separated from the adults and their case is decided as quickly as possible.*




Finally, violation of Article 5 of the Convention EDH for arbitrary detention from June 2012 with a view to his extradition;

artificial constitution of the American extradition request by agents of the Belgian State and abnormal treatment of this request by actions exceeding the framework of the Convention between the Kingdom of Belgium and the United States concerning mutual assistance in criminal matters, such as the provision of the Belgian criminal file, the assistance of the Public Prosecutor's Office in the preparation of the extradition request and the assistance of the Belgian authorities in the preparation of the request. the request by actions exceeding the framework of the Convention between the Kingdom of Belgium and the United States concerning mutual legal assistance in criminal matters, such as the provision of the Belgian criminal file, the assistance of the federal prosecutor's office in the drafting of the indictment), These acts constituted, on the one hand, a coalition of officials or at least an abuse of authority and, on the other hand, a violation of the *ne bis in idem* principle by allowing the appellant to be prosecuted and convicted in the United States for the facts relating to the attempted attack on Kleine Brogel;

deception by the Federal Prosecutor's Office during the judicial proceedings for the exequatur of the American indictment, resulting from the information given to the GCA as to the penalties incurred by the appellant in the event of conviction by the American courts;

violation by the extradition order of Article 3 of the ECHR as found by the judgment of the ECHR Court of 14 September 2014;

violation by the extradition order of article 3 of the ECHR for having authorized his extradition without carrying out a rigorous examination of the consequences of the return on the appellant's extremely precarious state of health, attributable to his conditions of detention in Belgium and while the Minister of Justice knew or should have known that the imposition of total isolation would cause the appellant serious mental or physical suffering;

Violation by the extradition order of the principle of speciality in extradition, the principle of *non bis idem* as enshrined in Article 5 of the bilateral extradition agreement between the Kingdom of Belgium and the United States of America and the res judicata effect of the CMA judgment of February 19, 2009, the judgment of the Court of Cassation of June 24, 2009, and the judgment of the Council of State of September 23, 2013;

violation by the Belgian authorities of Article 34 of the ECHR resulting from the surrender of the appellant to the American authorities, as found by the said judgment;

Violation of the appellant's right to a fair trial in the United States resulting from the refusal of the Belgian authorities to answer the questions asked by the defense and to give him access to certain documents useful to the appellant's defense;

---

J. *The penitentiary system includes treatment of convicts whose main purpose is their reformation and social rehabilitation. Young offenders are separated from adults and subjected to a regime appropriate to their age and legal status.*

Articles 417bis et seq. of the Criminal Code make it a criminal offence to subject a person to torture, inhuman treatment and degrading treatment.

PAGE    01-00D02881339-0025-0066-01-01-4

after the judgment of the European Court of Human Rights, the faulty abstention committed by the Belgian State, which failed to try to put the appellant back in a situation equivalent to the one he would have been in without the violations found by the European Court of Human Rights;

repeated violation of the principles of *non bis in idem,* speciality, and res judicata, by diplomatic notes addressed by the Belgian State to the American authorities.


The appellant also invokes

the wrongfulness of the decision of the Brussels Chamber of Indictments of February 19, 2009, which granted the exequatur to the international arrest warrant when the exequatur should have been totally refused, and of the decision of the Court of Cassation of June 24, 2009, which confirmed this decision;

the September 23, 2013, ruling by the Council of State that wrongfully rejected I aDpelant's appeal for annulment of the extradition order;

the erroneous information given by the Public Prosecutor's Office in its indictment of February 4, 2009 to the Brussels Indictment Division in charge of ruling on the exequatur of the international arrest warrant, on the penalties allegedly incurred by the appellant in case of extradition.


30.

The appellant attributes to one and/or the other of these breaches, the cause of the following damages

to have remained in isolation in Belgium for twelve years, with the consequences of a serious deterioration of his physical and psychological health;

having been deprived of the possibility of getting married because of incessant transfers between Belgian prisons;

having been arbitrarily deprived of his liberty during the extradition procedure;

be detained since October 2013 in the United States in inhumane and degrading conditions that degrade his physical and mental health, cause him obvious moral damage and deprive him of the possibility of maintaining his family relations,

to suffer the stress of the risk of being sentenced again for the facts for which he has already been judged in Belgium, and moreover by an incompressible life sentence. The claims that he is making, on the basis of articles 1382 and following of the Civil Code, are intended to compensate for these prejudices.

III.2.    On the requests relating to the conditions of detention in Belgium prior to extradition and the detention undergone with a view to extradition

31.

The appellant is making two separate requests, related to his detention in

Belgium.

     compensation for the moral damage wrongfully caused to him by the conditions of his detention in Belgium until his extradition; his main claim is for 75,000
23,000 and compensatory interest from June 2007; in the alternative, €23,000 and compensatory interest from November 2011.

In the alternative, if the Court does not consider itself sufficiently informed to allow the appellant's claims, it asks the Court to order the Belgian State to produce the complete administrative file relating to his detention between 2007 and 2013, and to order the reopening of the proceedings in relation to the points concerned;

     compensation for the arbitrary detention he believes he suffered from June 24, 2012 until his extradition, he claims compensation of € 52,000 and interest
compensatory payments as of July 1$^r$ 2012 and, in the alternative, €38,000 or, at the very least,
25,000 with compensatory interest from November 2014 or February 2017 respectively; in the infinitely alternative, he claims compensation of €25,000, at the
as loss of opportunity to obtain his release with compensatory interest from the date of 1$^{ir}$ November 2014.

The Belgian State argues that these claims are time-barred or at least unfounded.

### A.    On the exception of prescription

32.

Prescription is a defence to a late action; it does not begin to run until the day on which the action arises, which is, as a rule, the day on which the obligation must be performed.

The Court of Cassation decides for reasons that the court adopts that
*"Pursuant to Article 100, paragraph 1 of the State Accounting Laws coordinated on July 17, 1991, without prejudice to any other legal, regulatory or contractual provisions on the matter, all claims which, having to be filed in the manner established by law or regulation, have not been filed within five years from the first of January of the fiscal year in which they arose, are prescribed and definitively extinguished in favor of the State.*
*If, in the case of an unlawful act of authority, the claim arises, in principle, at the time when the damage occurs or at the time when its future realization is reasonably established,*



Court of Appeal Brussels -2020/AR/508 - p. 27

*however, when the authority's misconduct continues, the aforementioned presCription period does not begin to run at the earliest until the first of January of the budget year in which the misconduct ceased* (Cass.,February 2, 2017, C.15.0298.F, overturning a judgment of the Brussels Court of Appeal).

This lesson, stated with respect to the requirement of section 100 of the Coordinated State Accounting Laws, is also relevant to the

The five-year statute of limitations provided for in Article 2262bis, §1, paragraph 2, of the Civil Code, applicable to claims against the federal government since January 1, 2012, according to which "*any action for damages shall be brought within the period of five years.*

*compensation for damage based on extra-contractual liability shall be barred after five years from the day following that on which the injured party became aware of the damage or its aggravation and of the identity of the person liable*".

Continuous fault does not only mean continuous abstention from action; it can result from positive acts or decisions that have the effect of creating and maintaining an illegal situation; in this case, it is irrelevant, according to the Court, whether the situation in question results from a single decision or from successive decisions (see in this sense, in particular the judgment pronounced by this Court on January 30, 2020, in case 2014/AR/2258).

It follows from these considerations that, for the two disputed claims, the starting point of the statute of limitations was October 4, 2013, and that it ended on October 3, 2018, at midnight, the day of the citation.

33.

In citation, the appellant denounces the fact of having been kept in strict detention regime at *least* from November 11, 2011. He asks that the Belgian State be condemned to compensate him "*for the inhuman and degrading treatment inflicted in Belgium due to his unjustified and disproportionate detention in a strict regime from November 11, 2011, or at least from the order issued by the Court of First Instance in 2012*".

In his pleadings before the first judge, he criticized more broadly his conditions of detention throughout the period of incarceration and set the compensation claimed at 75,000 euros as the principal claim and 23,000 euros as a subsidiary claim.

Since the conditions of detention undergone by the appellant to serve his sentences are referred to in the summons, his claim on this count is not time-barred.

PAGE        01-00002881339-0029-0066-01-01-4



34.

On the other hand, the second request made for the first time in the appellate level is time-barred. It is true that the appellant complains in the summons about his continued detention for the purposes of his extradition (according to him from June 12, 2012, and more likely from June 25, 2012), criticizing the rejection of his requests for release by the investigating courts, but he does not claim any compensation on this count.

### 8. *On the violation of articles 3 of the Convention on Human Rights, 10 of the International Covenant on Civil and Political Rights and 417bis of the Penal Code*

35.

According to Article 3 of the Convention
*"No one shall be subjected to torture or to inhuman or degrading treatment or punishment.*


Article 10 of the International Covenant on Civil and Political Rights states

*All persons deprived of their liberty are treated with humanity and with respect for the inherent dignity of the human person.*

*(a) Accused persons shall, except in exceptional circumstances, be separated from convicted persons and shall be subject t o a separate regime, appropriate to their condition as unconvicted persons.*
*b)*
*The accused youth are separated from the adults and their case is decided as quickly as possible. possible.*
*3. The penitentiary system includes the treatment of convicts, the main purpose of which is their reformation and social reclassification. Young offenders are separated from adults and subjected to a regime appropriate to their age and legal status.*

Articles 417bis et seq. of the Criminal Code make it a criminal offence to subject a person to torture, inhuman treatment and degrading treatment.


36.

The ECHR Court[5] considers that the State must ensure that every prisoner is detained in conditions compatible with respect for human dignity, that the manner in which the measure is carried out does not subject the person concerned to distress or hardship of an intensity that exceeds the unavoidable level of suffering inherent in detention, and that, having regard to the practical requirements of imprisonment, the prisoner's health and well-being are assured



[5] See the Court's report on Article 3 of the Convention, 2020 version, and cases cited.

adequately. The fact that the poor conditions suffered by the detainee were not attributable to an intention to humiliate or belittle him must be taken into account, but does not definitively rule out a finding of a violation of Article 3 of the Convention. Thus, the absence of evidence suggesting that the authorities acted with the intention of humiliating or demeaning the applicant cannot alter the finding that the applicant was subjected to an ordeal of such intensity that it exceeded the unavoidable level of suffering inherent in a deprivation of liberty and resulted in a violation of Article 3. The Court stressed that persons in police custody are fragile and that the authorities have a duty to protect them.

37.

Regarding the particular conditions of detention to which persons convicted of terrorism offenses may be subjected, the European Court of Human Rights (see the website of the European Court of Human Rights, Guide to the case law of the European Court of Human Rights - Rights of detainees) considers that

Detention in a high-security prison, whether on remand or following a criminal conviction, is in itself an issue under article 3 of the Convention. Public policy considerations may lead States to establish high-security prisons for particular categories of prisoners, and in many States parties to the Convention, stricter security rules apply in respect of dangerous prisoners. Designed to prevent the risk of escape, aggression or disruption of the prison community, these regimes are based on segregation from the prison community accompanied by increased controls (Piechowicz v. Poland, 2012, § 161, and the references cited therein) ;

where such regimes are in place, however, Article 3 of the Convention requires the State to ensure that any prisoner is detained in conditions consistent with respect for human dignity, that the manner in which the measure is carried out does not subject the person concerned to distress or hardship beyond the unavoidable level of suffering inherent in detention, and that, having regard to the practical requirements of imprisonment, the prisoner's health and well-being are adequately provided for (Ibid., §162) ;

solitary confinement as such is not necessarily contrary to Article 3. Whether there has been a violation depends on the particular conditions of the measure, namely its severity, duration, I oDjective and effect on the person concerned (Rohde v. Denmark, 2005, § 93; Rzakhanov v. Azerbaijan, 2013, § 64). The prohibition of contact with other prisoners for reasons of security, discipline and protection does not in itself constitute a form of inhuman treatment or punishment (Ramirez Sanchez v. France [GC], 2006, § 123). On the other hand, complete sensory isolation combined with total social isolation can destroy the personality and constitutes a form of inhuman treatment which cannot be justified by the requirements of security or any other reason (!bidem, § 120);

Furthermore, a stay in isolation, even if relative, must be justified by reasons

└    *!**                                                                        ┘

serious and accompanied by the necessary procedural guarantees (A.T. v. Estonia (no. 2), 2018, § 73). Decisions to extend prolonged solitary confinement must be substantively reasoned in order to avoid any risk of arbitrariness, so as to make it possible to establish that the authorities have carried out an evolving review of the circumstances, situation and conduct of the detainee (Csüllög v. Hungary, 2011, § 31);

Finally, the decision to place the prisoner in solitary confinement must take into account the state of health of the person concerned (Jeanty v. Belgium, 2020, § 117) and regular monitoring of the prisoner's physical and mental health, to ensure that it is compatible with continued solitary confinement, must also be established.

38.

The appellant states that he was subjected to an extra strict regime, placed in a cell 24 hours a day, without a view of the sky or natural light and in the absence of human contact, that he was detained in penitentiary establishments in Flanders where he only received documents in Dutch and that he was not able to break the fast during the Ramadan period in Hasselt prison and finally, that he underwent numerous transfers which prevented him from getting married in accordance with his right to a private and family life.

39.

In this case, the court has the following elements of appreciation

Maintaining that his prison regime in the Forest prison is taking place in inhuman and degrading conditions of detention, the appellant lodged a first procedure before the judge of the summary proceedings of Brussels by summons of January 28, 2002; at this time, he was placed u n d e r  arrest warrant and was not yet definitively condemned. By an order of February 18, 2002, the interim relief judge rejected the application, noting that "*the applicant has not provided any prima facie evidence of the alleged inhuman and degrading treatment . . . . . . the applicant has not provided prima facie evidence that his right under article 3 of the European Convention on Human Rights has been violated, even if only in appearance. The application is therefore unfounded".* According to this order, the appellant complains of the absence of contact, of being deprived of daylight for five months, of being subjected to cell checks every ten minutes, of not being able to receive visits from the nurse, from a psychologist, of having CDs and the press. He also complained that he could no longer sleep. After having lodged an appeal, Mr. N. TRABELSI gave up this appeal in view of the improvement of his conditions of detention, as noted in a summary order of October 29, 2004;

By summons of October 28, 2003, the appellant, who had just been transferred to the prison in St. Gilles, instituted new summary proceedings. By order of November 28, 2003, the



The interim relief judge appointed a medical expert and put the case on trial at the hearing of January 16, 2004. The Belgian State appealed this decision. At the hearing of May 13, 2004 of the Court of Appeal of Brussels, the parties declared that the request had become moot, the appellant having, in the meantime, been transferred to the prison of Nivelles, after a very brief stay in St-Gilles;

the appellant remained in Nivelles prison until 16 July 2004. Following an incident (Mr. Trabelsi allegedly made threats to attack another inmate incarcerated in the same institution), the appellant was temporarily transferred to St. Gilles prison and then transferred to Lantin prison on August 9, 2004. He did not lodge any complaints during his incarceration in Nivelles;

detained a t  the Lantin prison, the appellant issued a new summons on August 24, 2004. A first order of October 29, 2004, appointed a medical expert to describe the appellant's state of health and to indicate the measures required to remedy any physical or psychological alterations that might be observed. After the expert's report, the summary judgment judge stated in an order of August 1" 2005 that the appellant was placed in the "U block", initially in a "stainless steel monobloc" cell and from September 1" 2004 in a "stainless steel monobloc" cell.
"The appellant was subjected to a regime known as "extra solitary confinement" justified by security requirements, the legality of which was not contested, and that "*the conditions of detention of Mr. Trabelsi appear, in view of the various elements in our possession, to be described as follows.*

*He occupies a cell located in the U block of the Lantin prison; this cell measures approximately 12 m2; Mr. Trabelis has a bed, a table, shelves, a toilet and a sink*
*There is a window, lined with an interior grill, allowing a view on the outside; this window gives however on an external court and the sight is cut by a building ëlevë SltUë with a few meters (6 or 7 m);*

*- The U block is composed of about ten cells,' A great silence reigns there;*

*Mr. Trabelsi has in his cell many books, leaflets, photos, papers, a radio and cassettes; he also has his own clothes; according to information provided by the Belgian State, he could also have a hot plate (but does not ask for it),*

*- As regards the contacts that Mr. Trabelsi has with third parties, Mr. Trabelsi can write and receive mail (according to the guardian, he writes a lot, although Mr. Trabelsi told the expert that he has been tired of it for some time). However, Mr. Trabelsi told the expert that he has been tired of this for some time), he can make phone calls (in this regard, he was allocated an additional amount by the prison administration in order to be able to use this option), he has the right to receive visits from his relatives twice a week in the ordinary visiting room, visits from religious representatives, representatives of the Supervisory Board, as well as visits from his lawyers, the*



*judicial and other official services,.... In practice, however, he does not receive any visits from his family, but he does receive regular visits f r o m  a prison visitor (for at least one hour), and he also maintains contact with one of the magistrates who has dealt with his case. Finally, he also maintains contact with the guards and he himself told the expert that the guards were kind and respectful, specifying that "several times a day, one o f  them comes to talk with me... (The developments devoted in terms of conclusions by Mr. Trabelsi, "to the prison officers and the fact that they would be hostile to the "Islamists" seem, in view of these statements little understandable in addition to the fact that they do not appear to be demonstrated);*

*- As far as his outings and occupations are concerned, he is allowed to go out every day, in the courtyard, twice for an hour; twice a week, he is also allowed to go for an hour in the large courtyard; he is always alone during these outings; however, it seems that Mr. Trabelsi does not go out much. The Belgian State also specifies that Mr. Trabelsi was recently offered paid work in the cell, but that he refused this proposal;*

*- Mr. Trabelsi is checked every 30 minutes;*

*- Mr. Trabelsi seems to be able to consult doctors, psychologists and social workers if necessary; he is therefore subject to medical monitoring and, in particular, had a knee operation at the beginning of 2005,*

*Finally, it should be noted that this regime is subject to regular evaluations; That the Belgian State specifies that it is through these evaluations that it was proposed to Mr. Trabelsi to go once a week to the saddle of musculotion.*

This summary order further states that:

*"the expert[6] found that the physical condition of Mr. Trabelsi was not altered by detention;*

*That at the time of the expertise, he was not treated for any pathology; That since IONS, it appears from the elements in our possession that Mr. Trabelsi consulted the doctor of the prison for sleep disorders (disorders of which he had not complained to the expert); That it appears from the documents deposited by t h e  Belgian State that a treatment w a s administered to Mr. Trabelsi for these disorders and that Mr. Trabelsi said he was appeased by the treatment; That in her certificate of 23.06.05, the psychiatrist of the prison specifies that Mr. Trabelsi said that he was appeased by the treatment; That in her certificate of 23.06.05, Mr. Trabelsi said that he was appeased by the treatment. That in her certificate of 23.06.05, the prison psychiatrist stated that Mr. Trabelsi "does not present any symptoms of thymic decompensation, nor major anxiety. (in view of this recent certificate, it does not seem appropriate to provide for a hearing of this psychiatrist or other staff members as requested, in the alternative by Mr. Trabelsi);*

*Whereas, if the expert has indeed found a certain morosity in the head of M.*

---

The appellant does not file the report.

*That, although the judge, who was in charge of the case of Mr. Trabelsi, stated that it was obvious that Mr. Trabelsi was suffering from both his fate and an incarceration whose modalities did not seem justified or fair to him, he considered that he could not conclude that Mr. Trabelsi was suffering from a depressive disorder; That he therefore CONCIUED that Mr. Trabelsi was not suffering from physical or psychological alterations related to the conditions of his incarceration ,*

*That these conclusions do not appear contradictory with the body of the report;*

*That the expert exposes, indeed, the reasons of the moroseness noticed chief' Mr. Trobelsi (incomprehension of the regime of isolation, disappointment in relation to the past life,...), reasons which certainly still occure the difficulties inherent to the deprivation of freedom;*

*That the expert believes that it is clear that his isolation seems extremely heavy, the expert adding that he does not feel that Mr. Trabelsi is bluffing when he says he does not understand* the *reason for the extreme measures taken against him;*

*That this lack of understanding is, according to the expert, likely to explain the state that Mr. Trabelsi presents, a state made of morosity, unanswered questions, suffering also related to the lack of contacts,...*

*That the expert adds that Mr. Trabelsi is, without doubt, also disappointed in his failure, what he lost, ... ,*

That *the expert concludes that if Mr. Trabelsi bears his fate badly and an incarceration whose modalities do not seem justified or fair to him, he cannot however consider that he presents a depressive disorder;*

*That the conclusions of the expert do not appear, in view of these elements, to be in any way contradictory to the findings and developments made by the expert throughout his report.*

The appellant did not appeal this order and did not initiate any further proceedings until a summons on April 7, 2008.

In April 2007, a psychiatrist who has been following the appellant for several years and met him in the U block of the EP of Lantin, wrote

*"Since he left the EP of Andenne, Mr. Trabelsi seems to have calmed down, to have found reference points that allow him to refocus on himself, his difficulties, his sufferings, his hopes, his projects; He seems to have taken the time to re-analyze a path that led him from soccer to Afghanistan and then to incarceration, and even if there are still some obscure areas, I felt that he was more in tune with himself (less divided and therefore less interpretative), more concerned about a future without tumult, without "glitter" (which his two "professions" and the media hype surrounding them have somehow conferred on him), based on the resumption of a "simple" family life where the quest would be above all that of the Other, of happiness and of shared human values.*



*Two significant events probably guided him in his choices. The death of a father whom he knew very little and in an ambivalent way and whom he had not ceased to seek through various emblematic figures and heroic (if not acceptable) acts. As if this death, beyond the quite understandable suffering that it generated, had allowed him to be born to himself, an adult. Secondly, the epistolary encounter with a middle-aged woman, already a mother, with whom bonds of affeCtion and tenderness are gradually forged. Note that the previous wives were younger.*

*During this last interview, Mr. Trabelsi made very recent complaints: osthenia, concentration disorder and therefore memory retention, discouragement, feeling of impotence, clinophilia (going as far as neglecting to write to his Mother)... suggesting a depressive symptomatology that he had already presented in Andenne.*

*More worrying although criticized are the visual (mice or shadows running on the floor) and auditory (voices, whispers) hallucinations (or illusions? because they are always hypnagogic) which probably indicate a long-lasting sensory semi-deprivation, especially since Mr Trabelsi is and remains fragile.*

*Consequently, I think that it could be pejorative for him to be thus maintained in a strict special regime. On the other hand, and given the length of the latter, a sudden return to a normal regime would certainly be anxiety-provoking and a source of unnecessary excitement; I suppose that between the two it must be possible to imagine a regime that is gradually normalized through successive enlargements. In particular, I think that Mr. Trabelsi hopes to be allowed to receive visits from the one he already calls "his wife". Without knowing her, I can imagine that she would contribute to re-inserting Mr. Trabelsi into a more daily, more down-to-earth and, all in all, more "normal" reality than that of the prisons and, in particular, the one inside where his status as "Islamist-terrorist" kept him;*

At the end of 2007, the appellant was transferred to Nivelles prison, where he remained until the beginning of 2009. According to a summary order of April 30, 2008, the appellant was subjected to a special security measure in Nivelles as of December 21, 2007, which was renewed on December 28, 2007, January 4, 2008, January 11, 2008, January 16, 2008 and March 12, 2008, but there is no evidence of any violation of article 3 of the ECHR;

On March 12, 2008, Mr. H. MEURISSE took a decision to place him under a special individual security regime that was less strict than the previous ones. Nevertheless, on April 7, 2008, the appellant summoned the Belgian State before the interim relief judge, who noted in an order dated April 30, 2008 that

- the caller receives medical follow-up,



- Visits are allowed in the ordinary visiting room behind the glass,

- he has numerous contacts with his lawyers, either through visits to the prison or telephone conversations, at any time,

- He has the possibility to read books in his cell, to listen to music. He has a television and takes correspondence courses,

- he can exchange correspondence, subject to control by the Management, and can phone outside, to authorized numbers,

- he has the possibility to participate in the common mini-football twice

a week. The judge also noted that

*These measures will be relaxed on April 9, 2008, taking into account the reduction of the threat, the medical reports of Drs. PIETQUIN and MOREAU as well as certain wishes of Mr. N. TRABELSI which will be met, such as his wish to play sports and to meet his wife in an individual visiting room. Consequently, the Court concludes that Mr. N. TRABELSI cannot be considered as being detained in complete sensory isolation or in total social isolation. His isolation being, primo facie, partial and relative, it does not constitute an inhuman and* degrading *treatment with regard to article 3 of the European Convention on Human Rights;*

At the beginning of 2009, the appellant was transferred to Bruges, but he did not stay there because he was transferred again to Lantin in March 2009 and then to other prisons in the country. The appellant is kept in a special security regime;

On July 7, 2009, a psychiatrist wrote to the management

*"I would like to give you my opinion concerning Mr. TRABELSI. This certificate is made at his request and with his agreement.*

*Mr. TRABELSI is regularly followed up at my psychiatric consultation in the high security area of the prison of Lantin.*

*At the request of Mr. TRABELSI, I would like to inform you of the difficult psychological situation caused by the confinement and isolation.*

*Let me make the link and a continuation of the report made by Doctor De Rouck, the psychiatrist who followed and knew well Mr. TRABELSI during his stay in the prison of Andenne. Dr. De Rouck mentions in his report the progress made by Mr. TRABELSI in terms of his reintegration into a more adequate psychosocial and political reality. On the other hand, and as also noted in my colleague's report, the psycholOgical state linked to the conditions of isolation is in constant suffering and is* progressively *deteriorating. I did not observe psychotic symptoms during my interviews, but auditory and visual hallucinations as well as depressive signs have*



*was noted by DE De RoUCk. These depressive symptoms are present at present. Mr TRABELSI presents a sadness of the mood, anguishes, sleep disorders, appetite disorders, and at the time of our last interview, SUICIDARY IDEAS* " ;

On November 11, 2011, Dr. DE ROUCK concludes to a complex pathology, composed of a major depressive disorder of great intensity of a generalized anxiety disorder related in particular to the uncertainty hovering over all the decisions concerning him, and notes the impact of ten years of particular security regime namely the loss of temporo-spatial reference marks, social skills, circadian rhythms, tendencies to procrastination, difficulties of concentration, inadequate emotional reactions;

on June 11, 2012 and December 5, 2012, psychiatrists from the prisons of Brugge and Hasselt where the appellant is located confirm the descriptions of Dr. DE ROUCK;

on February 4, 2013, Dr. DAILLET believes that, given the appellant's health condition, there is a need to relax in the direction of less social isolation and this is urgent. The family meetings must be continued and extended, as far as possible;

on June 7, 2013, the General Directorate of Prisons decides to relax the detention regime of the appellant and on July 24, 2013, Dr. DA!LLET finds that, following the transfer of the appellant to the prison of lttre, the regime is applied with measure and with respect for the person of the appellant ;

however, on ieAugust 2013, the Director General of Prisons informs the Director of the lttre prison that it is necessary to place the appellant for a period of two months: from 07.08.2013 until 05.10.2013 inclusive, under a special individual security regime more strict.

40.

It follows from these findings that, although the appellant was not completely segregated, he remained under the so-called "extra" regime that was practiced by the administration before the Principles Act came into force, and that from the entry into force of that Act he remained under a special security regime.

41.

In the  absence of a psychiatric report for the period prior to April 2007 and



In view of (i) the detailed factual observations made in the interim order of 11 August 2005 on the basis of a judicial expert's report, (ii) the fact that the appellant did not appeal against this decision, (iii) the fact that he also abandoned his appeal against the order of 18 February 2002 due to the improvement of his detention conditions, (iv) the absence of any complaint during his imprisonment at Nivelles, the appellant does not demonstrate that the conditions of detention were contrary to Article 3 of the ECHR for the entire period of incarceration.

However

further investigation of the case is warranted for the period of the appellant's incarceration at Forest Prison from January 2002 until his transfer to St. Gilles Prison, presumably in October 2003; decisions relating to the conditions of the appellant's detention during this period must be disclosed and filed with the accompanying administrative records;

for the period from July 7, 2009 to July 24, 2013 and from August 7, 2013 to October 3, 2013 it is necessary to examine whether, in accordance with Article 3 of the ECHR, the authority reasonably took into account the appellant's medical condition as described in the above-mentioned medical reports, when determining the particular security measures. Prior decisions and opinions must be produced and communicated.

finally, for this same period, in view of the frequency of transfers from one prison to another, it is necessary to order the production of the decisions and administrative files from which these transfers result.

42.

The production and communication of these documents is the responsibility of the *Belgian State,* which alone has full access to them and justifies reopening the proceedings so that the parties can exchange their arguments on these documents.

### C.    *On the absence of an effecti[*

43.

It appears from the summary proceedings described above that the appellant falsely claims that "*the remedies available to the appellant were not effective, rendered ineffective by his untimely transfers. It is apparent that the Courts and Tribunals did not rule on the inhumane and degrading nature of Appellant's continued confinement in segregation from June 2007 or, at the very least, from November 2011. The last time the appellant brought a case before a Judge, the Judge declared himself territorially incompetent, following a transfer, on January 5, 2010 (Exhibit X.8).*"

It is still wrong to complain of a violation of his right to an effective remedy resulting from an improvement in these conditions of detention by indicating that



*"On April 30, 2008, the Judge of Referees declared Mr. Trabelsi's request unfounded because, two days after being cited in court, the respondent had relaxed the conditions of detention.*

This was the purpose of this procedure.

### III.3.    On requests for injunctions relating to judicial cooperation

#### A.    *On the main application*

44.

As a principal claim, the appellant asks the court to give t h e Belgian State the following injunctions

*Enjoin t h e Belgian State to cease any type of cooperation with the American authorities for the prosecution and trial of Mr. TRABELSI, under penalty of a fine of*
*10.000 € per day from the date of service of the judgment to intervene, with a ceiling of 500.000*

*More specifically:*

- *refuse to grant authorization to execute any new request for international assistance in this case;*

- *prohibit members of the judicial police from assisting U.S. prosecuting authorities through formal or informal communications;*

- *withdraw the authorization granted to "its agents", in the context of the request f o r American international judicial assistance and enjoin all "its agents", better identified in Exhibit VI.d.4 (investigating judge, judicial police officers, etc.), to go and testify in the United States as agents of the Belgian State.*

In the alternative, I! requests

*"At the very least, to enjoin the Belgian State to notify the judgment to be delivered to each of these persons, identified within the framework of international cooperation and called to testify in the United States, and to invite them to take due note of it, especially with regard to the paragraphs relating to the request for cessation of international cooperation, the violation of res judicata, the violation of the principle of non bis ln idem, and the violation of the principle of speciality of extradition.*



Court of Appeal Brussels -2020/AR/508 - p. 40

45.

The appellant states in substance that by having lent and continuing to lend their judicial collaboration to the prosecutor in charge of prosecuting him in the United States of America, the Belgian judicial authorities continue to violate the principles of non *bis idem* and of speciality, and thus increase the risk for the appellant of being sentenced to a term of imprisonment for life, contrary to article 3 of the ECHR Convention

According to the appellant, the Belgian judicial authorities are also guilty of violating the principle of equality of arms and the appellant's rights of defence, in that they are feeding the prosecution while refusing to allow the appellant's counsel to answer their questions and to give them access to the documents they are requesting.

Thus, this judicial collaboration, already begun when the indictment was prepared and continued since his extradition, would violate the fundamental rights of the appellant as recognized, not only in domestic law, but also by *jus cogens,* whereas respect for these rights takes precedence over the respect due to the bilateral Convention on Mutual Legal Assistance concluded between the Kingdom of Belgium and the United States of America, as it would appear from article 53 of the Vienna Convention on the Law of Treaties of May 23, 1969.

46.

By the inter!ocutory judgment of July 15, 2020, the court declared this request inadmissible. Contrary to what the Belgian State maintains, the court ruling on the merits is not bound by this decision, as the court ruled *prima facie* in response to a request for urgent and provisional measures, which cannot bind it on the merits.

47.

The bilateral convention on mutual legal assistance signed in Washington on January 28, 1988 between the Kingdom of Belgium and the United States of America, which entered into force on January 1, 2000[7] , provides that

*A". 1st field of application*

*1. The Contracting States shall, in accordance with the provisions of this Convention, afford one another mutual legal assistance in all matters relating to the investigation, prosecution and punishment of offences.*

---

[7] Articles 4, 5, 6, 7, 8 and 9, §1, of this bilateral Convention were amended or supplemented by the Agreement between the European Union and the United States of America of June 25, 2003 (O.J., J.181/34, of July 19, 2003). The bilateral instrument attached to this Agreement lists the substantive provisions of the Agreement that supplement the bilateral Convention, for offenses committed after the entry into force of the Agreement and for those committed before it (Article 12 of the Agreement) (see Senate, session 2008-2009, 4-1183/1 Explanatory Memorandum on the bill assenting t o  this Agreement). An Act of February 12, 2009, gives assent to the Agreement and the Instrument.



2. *Mutual legal assistance applies to, among other things.*
*a) the location or identification of persons;*
*b) delivery of documents,*
*c) disclosure of information and objects including documents, records and evidence;*
*d) the hearing of witnesses and the production of documents;*
*e) the execution of search and seizure requests,*
*f) the transfer of detained persons for the purpose of being heard as witnesses or to other purposes;*
*g) loco/isot/on, search, /'ITTObi//sot/on, seizure and confiscation of illicit gains, and to*
*h) restitution of property to victims of crime.*

3. *Unless otherwise provided in this Convention, assistance shall be afforded with respect to any offence punishable under the laws of the requesting State.*

Article ierf h "ta 4, provides

*"This Convention is concerned only with mutual legal assistance between the Contracting States. It does not confer any new rights on individuals with respect to obtaining, withholding or excluding evidence, nor does it allow them to oppose the execution of a request.*

*Article 13 Limits on mutual assistance*
1. *The Central Authority of the requested State may refuse to process an application if.*
*a) execution of the request would undermine the sovereignty, security or other essential public interests of the requested State;*
*b) (...)*
*c) (...)*

3. *If a refusal is contemplated under this Article, it shall be preceded by consultation between the Central Authorities to determine the conditions, if any, under which mutual assistance may be provided.*
*If the requesting State accepts mutual assistance under these conditions, it undertakes to respect them.*
*(...) ".*

48.

On the basis of the aforementioned article 13, the appellant considers that in this case, the preservation of the essential public interests of the State includes respect for the fundamental rights of the appellant resulting from the ECHR and *jus cogens*, which would oblige the Belgian State to terminate judicial cooperation in order to respect these fundamental rights.



Court of Appeal Brussels - 2020/AR/508 - p. 42

However, Article 13 does not allow the Belgian State to unilaterally terminate the cooperation requested by the U.S. authorities; it organizes a consultation procedure from which the Belgian State could not evade without violating this treaty provision, which is binding on it and on the domestic courts.

49.

Finally, when a treaty violates *jus cogens,* the 1969 Vienna Convention on the Law of Treaties reserves to *the signatory parties* the possibility of requesting its annulment or suspension, but it does not give the domestic courts of a signatory party the power to refuse to apply it on the grounds that it violates *jus cogens.*

The main application is inadmissible.

### B. *On the alternative claim*

50.

The Appellant requests that the Belgian State be enjoined *"to notify the judgment to be delivered to each of these persons, identified in the context of international cooperation and called to* testify in the *United States, inviting them to take due cognizance of the judgment, particularly with regard to the paragraphs relating to the request for termination of international* cooperation*, the violation of res judicata, the violation of the principle of non bis in idem and the violation of the principle of speciality of extradition".*

51.

The Bilateral Convention on Judicial Cooperation does not constitute an obstacle to the admissibility of this request.

Indeed, Article 4 "Appearance of Witnesses and Experts in the Requesting State" provides that

> *1. If the requesting State considers the personal appearance of a witness or expert before its judicial authorities to be particularly necessary, it may so state in the request and the requested State shall* invite *the witness or expert to appear. The requested State shall immediately forward the response of the witness or expert to the requesting State.*
>
> *(...)*
>
> *3. A witness or expert who has failed to comply with a summons to appear, the surrender of which has been requested, shall not be subject to any penalty or measure of constraint in the requested State, even if the summons contains injunctions.*



Witnesses who are requested by the U.S. authorities are not required to answer and appear, and the State cannot compel them to do so.

The request is admissible.

52.

The respect owed by the Belgian State to the appellant for the *ne bis idem* principle justifies the injunction requested in the alternative.

The *ne bis in idem* principle is recognized by the Belgian and American authorities in Article 5 of the Extradition Convention concluded between the Kingdom of Belgium and the United States of America on April 27, 1987 in the following terms

> *"Extradition shall not be granted if the person claimed has been convicted and sentenced or OCÇUittë in the requested State for the offence for which extradition is requested*,

The Court of Cassation issued two judgments, which are res judicata for the parties and the court.

According to the decision of the Court of Cassation of June 24, 2009 (already cited under No. 9 above):

> *"In providing that extradition shall be refused when the request concerns an offence for which the person sought has already been tried in the requested State, article 5.1. of the Extradition Convention between the Kingdom of Belgium and the United States of America refers to the identity of the fact and not to the identity of the qualification"* (judgment of June 24, 2009 on *the* exequatur of the international arrest warrant issued against the appellant).

According to the judgment of the Court of Cassation of March 4, 2021, which rejects the appeal of t h e Belgian State against the summary judgment of August 8, 2019 by this Court (see above, no. 22), article 5.1. of the 1987 Extradition C o n v e n t i o n "*refers to the identity of the fact and not to the identity of the qualification*". Furthermore, the Court stated that

> *"In the case of a person who is the subject of an extradition from the Kingdom of Belgium to the United States, it does not follow that this person has no apparent right against the Belgian State based on the general principle of non bis in idem law enshrined in Article 5.1. of the Extradition Convention*.

53.

The principle of speciality of extradition guaranteed by article 3 of the law of March 15, 1874 on extraditions and article 15 of the aforementioned bilateral extradition convention of April 27, 1987 also justifies an injunction, in that according to this legal provision

> *"Extradition shall be granted upon production of the warrant of arrest or any other act*

Cour d'appel Bruxelles – 2020/AR/508 – p. 44

> *with the same force, issued by the competent foreign authority, provided that these documents contain a precise indication of the fact for which they are issued and that they are rendered enforceable by the chamber of the court of first instance of the place of residence of the foreigner in Belgium or of the place where he can be found.*

And

> *"(1) A person extradited under this Convention shall not be detained, tried or punished in the requesting State except .*
>
> *(a) for the offence for which extradition has been granted or for an offence otherwise qualified and based on the same facts for which extradition has been granted provided that such offence is an extraditable offence or a lesser offence included in the offence for which extradition has been granted,*

In this case, the judgment of the Brussels Chamber of Indictments of February 19, 2009, confirmed by the above-mentioned judgment of the Court of Cassation of June 24, 2009, which is also res judicata, does not grant exequatur for the facts for which the appellant was convicted in Belgium.

54.

The requested injunction is likely to ensure compliance with these two principles and with the res judicata effect of the above-mentioned judicial decisions.

The Belgian State is therefore ordered to notify the present judgment to each of the persons who are or would be called to testify in the United States, inviting them to duly take cognizance of it, particularly with regard to the request for the cessation of international cooperation, the violation of res judicata, of the principle of *son bis in idem* and of the principle of speciality of extradition as soon as witnesses could be invited to appear before the American courts and be called upon to provide information relating to the facts excluded from the enforcement granted to the international arrest warrant.

The penalty requested by the appellant is however not justified; indeed, on the one hand, the persons to whom the judgment must be notified are not identified by the appellant, nor is the time from which the penalty should be imposed, and on the other hand, in the event that the Belgian State does not comply, it will be possible for the appellant's counsel in the United States to communicate this judgment to the witnesses and experts who would be summoned to appear before the American courts.



Court of Appeal Brussels - 2020/AR/508 - p. 45

### III.4.    On the request to send a diplomatic note

**55.**

Still with a view to obtaining compliance with the principles of non *bis idem,* speciality and res judicata in the context of the proceedings currently being conducted against him, the appellant asks the court to order the Belgian State to

- to send a diplomatic note to the American authorities, within two days of the service of the judgment to intervene, indicating that the exequatur of the arrest warrant of Mr. TRABELSI was refused for the "over acts" 23 to 26, on the basis of article 5 of the bilateral Convention of extradition of April 27, 1987 between the Kingdom of Belgium and the United States of America ; that this limitation on extradition is an integral part of the Ministerial Extradition Order of November 23, 2011; that Article 5 of the Bilateral Extradition Convention, concerning the principle of non bis in idem, refers to an "identity of fact" and not to an "identity of offence"; that consequently, i! would be contrary to the principle of speciality, provided for in article 15 of the bilateral extradition convention, to prosecute Mr. TRABELSI for the "over acts" 23 to 26, i.e. the facts relating to the attempted attack using explosives on the military base of Kleine Brogel" and to attach to the above-mentioned injunction a penalty of 10,000 € per day of delay with a ceiling of 500,000 €;

"to prohibit the Belgian State from distancing itself in any way, in its official communications, from what has become res judicata and is not contested by it in the context of the present proceedings, whether by sending several successive diplomatic notes, by using quotation marks or by "informing" the United States of the introduction of an appeal in cassation, under penalty of a fine of €500,000;

**56.**

As the Belgian State objects, this request is not admissible for lack of current interest.

In fact, in number 22 of this judgment, the court has already recalled the *two* interim judgments in which it met this request and granted it to the extent permitted by the principle of the separation of powers.



III.5.    On the claims relating to the appellant's detention in the United States.

57.

The appellant asks the court to enjoin the Belgian State to "*take all useful steps in order to allow/facilitate his return to Belgium (issuance of a laissez-passer, organization of the return regardless of the conditions imposed by the United States, financial responsibility for the return, etc.)*" and

"*In the meantime or in the event of iiTlÇOSSlbilitë of return, to enjoin the Belgian State :*

- *to organize a monitoring of the health situation of Mr. TRABELSI, via the Belgian consular services in the United States and/or by sending a psychiatrist in order to ensure the follow-up necessary by the situation of the caller and any other specialist doctor whom it would appear that Mr. TRABELSI needs;*

- *to request the authorizations of visit for the consular authorities and/or the doctors referred to above within eight days of the judgment to intervene, under penalty of a fine of*
  *5.000 € per day of delay, with a ceiling of 500.000€,*".

- *to enjoin at least the Belgian State to send an omicus curiae to the American authorities, relaying the concerns expressed by the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment and the Special Rapporteur on the promotion and protection of human rights and fundamental freedoms while countering terrorism, by drawing* the attention of *the American authorities to the precarious state of health of the appellant at the time of his extradition, t h e  evolution of his conditions of detention in Belgium, the exact conditions of his detention at the time of his extradition, the various reasons* that *justified the extension of his prison confinement in Belgium, the recommendations made by Belgian doctors concluding that it was necessary to reduce the isolation of t h e  appellant, as well as the psychological, medicinal and medical follow-up that he was receiving at the time of his extradition.*

In addition, the appellant claims the following benefits

103.500,00 € for the damage caused by this degrading detention with compensatory interest since October 2013 ;

1 € provisional on an indemnity not currently assessable for future detention in the United States ;

1 € provisional for medical expenses required by his state of health;

1 € provisional in relation to the permanent incapacity resulting from its conditions of detention;

1 € provisional for the expenses necessary to maintain its family relations;




1.500, 00 € for the damage caused by the violation of his right to marriage and family life with compensatory interest since October 3, 2013.

58.

The appellant seeks these injunctions and indemnities on the basis of Articles 1382 et seq. of the Civil Code in order to obtain compensation for damages which he attributes to the following faults (in chronological order)

artificial constitution of the American extradition request by agents of the Belgian State and abnormal treatment of this request by actions exceeding the framework of the Convention between the Kingdom of Belgium and the United States concerning mutual assistance in criminal matters, such as the provision of the Belgian criminal file, the assistance of the Public Prosecutor's Office in the preparation of the extradition request and the assistance of the Belgian authorities in the preparation of the request. the request by actions exceeding the framework of the Convention between the Kingdom of Belgium and the United States concerning mutual legal assistance in criminal matters, such as the provision of the Belgian criminal file, the assistance of the federal prosecutor's office in the drafting of the indictment), These acts constituted, on the one hand, a coalition of officials or at least an abuse of authority and, on the other hand, a violation of the ne bis in idem principle by allowing the appellant to be prosecuted and convicted in the United States for the facts relating to the attempted attack on Kleine Brogel;

deception by the federal prosecutor's office during the judicial proceedings for the exequatur of the American indictment, on the penalties incurred by the appellant in the event of conviction by the American courts;

violation by the extradition order of Article 3 of the ECHR as found by the judgment of the ECHR Court of 14 September 2014,

violation by the extradition order of article 3 of the ECHR for having authorized the extradition of the appellant without carrying out a rigorous examination of the consequences of the removal on the extremely precarious state of health of the appellant, attributable to his conditions of detention in Belgium and when the Minister of Justice knew or should have known that the imposition of total isolation would cause the appellant serious mental or physical suffering;

violation by the extradition order of the principle of speciality in matters of extradition, of the principle of non *bis idem* and of the res judicata effect of judicial decisions ;

Violation by the Delge authorities of Article 34 of the ECHR Convention due to the surrender of the appellant to the US authorities, as found by the ECHR judgment;

after the judgment of the European Court of Human Rights, the Belgian State's wrongful abstention from trying to put the appellant back in a situation equivalent to the one he would have been in without the violations found by the European Court of Human Rights;

violation of the principles of non *bis in idem,* speciality, and res judicata by diplomatic



notes sent by the Belgian State to the American authorities.

PAGE      01-00002881339-0047-0066-01-02-4

A.    *Fault resulting from the violation of the suspension measure ordered by the ECtHR and causal link with the alleged damage*

59.

As a rule, the executive branch commits a fault when it violates, by action or omission, hierarchically superior rules that impose an obligation to act or refrain from acting, when it cannot invoke an invincible error or some other cause of justification, or when it disregards the "general duty of care" imposed on all persons by virtue of articles 1382 and 1383 of the Civil Code. Violation of a higher norm of an international treaty is only wrongful if that norm has direct effect in domestic law.

60.

In this case, the violation of the suspension measure ordered by the European Court of Human Rights and consequently of article 34 of the European Convention on Human Rights constitutes a fault on the part of the Belgian State.

Insofar as necessary, your court specifies that it has the power of jurisdiction to
To be aware that these violations were committed by the Belgian State while the appellant was under its jurisdiction within the meaning of article 1 ^of the ECHR.

61.

Article 34 of the ECHR states

*"The Court may be seized of an application by any person, non-governmental organization or group of individuals claiming to be the victim of a violation by one of the High Contracting Parties of the rights recognized in the Convention or its protocols. The High Contracting Parties undertake not to hinder by any means the effective exercise of this right"* (emphasis added by the Court).

In the judgment of September 14, 2014, the ECtHR recalls "*the crucial importance and vital role of provisional measures in the Convention system",* that it granted *the* appellant's request to stay the extradition on the same day as the notification of the ministerial extradition order; that it refused three times to give a positive response to the Belgian Government's requests to lift the provisional measure and specified, on several occasions, that the said measure was appropriate until the outcome of the proceedings before it.

The Court considers that "*the Government was therefore fully aware of the scope of the measure".* However, *it "deliberately and irreversibly lowered the level of protection of the rights enshrined in Article 3 of the Convention (....). At the very least, extradition has removed*



*the possible finding of a violation of the Convention, as the applicant has been removed to a country that is not a party to this instrument".*

*" 150. The Court considers that none of the arguments put forward by the Belgian Government could justify non-compliance with the interim measure. It is true that the Government never concealed from the Court its embaFFOS ViS-Ô-Vis of the American authorities and its wish to see the provisional measure lifted. However, at no time did the Government indicate that it had taken any steps to explain the situation to the U.S. authorities (...). Moreover, given that the Court had examined all the elements put forward by the Government in order to convince it to stop the measure, including the diplomatic assurances provided by the American authorities, but had rejected them, it was not for the Belgian State, following the judgment handed down by the Council of State, to substitute its assessment of these assurances and of the merits of the application for that of the Court in order to decide to exceed the provisional measure indicated by the Court.*

*"154 By deliberately not complying with the provisional measure indicated under article 39 of its regulations, the respondent State failed to comply with its obligations under article 34 of the Convention.*

These grounds establish the violation by the Belgian State of a provision of international law with direct effect in the internal order which imposed a specific obligation on it.

62.

On the other hand, these reasons indicate that, according to the ECtHR, the Belgian State does not justify the violation of the suspension measure and the Court fully agrees with this assessment.

Contrary to the Belgian State's contention, it has not been established that the precipitous and early surrender of the appellant to the U.S. authorities was justified by the dangerousness of the appellant on Belgian territory, or by a risk of evasion in the event of his release, or by a risk of escape or threat to public order and security after the Council of State's judgment of September 25, 2013, or by that judgment itself, or finally by the length of the appellant's extradition detention.

Indeed, the

appellant's contacts within the prison were limited and monitored;

there was no reason to fear his release. On the contrary, by an order of August 28, 2013, the Nivelles Council Chamber had just rejected a request for release filed by the appellant, and this order had just been confirmed by a judgment of September 12, 2013 of the Indictments Chamber deciding that the reasonable time limit had in no way been exceeded "*since the Belgian State has done everything possible to extradite him as quickly as possible, if the appellant is currently still detained, it is only*



PAGE    01-00002881339-0049-0066-01-02-4

*because of the appeals he filed against the extradition decision, which is certainly his right but makes it inappropriate to invoke a delay attributable to him; finally, the applicant will be determined shortly on his fate since the case is set before the Council of State for pleadings on September 19, 2013 and since the European Court of Human Rights has undertaken to rule as soon as possible after the Council of State has rendered its judgment ;*

the risk of escape is not established by any document submitted to the court;

finally, the Belgian State could not legitimately believe that the decision of the Council of State authorized it to defy the suspension measure ordered by the Court of Human Rights. The sole effect of this judgment is to reject the appeal lodged by the appellant against the extradition order and not to annul the suspension measure in question. The Court also notes that in a letter dated June 26, 2013, the Minister of Justice informed the Court that the decision of the Council of State was expected shortly, adding

> *"As for the proceedings pending before your Court, we take note of the fact that the provisional measure not to extradite the applicant to the States until the end of the proceedings before the Court (and not before the Council of State) has been maintained, and of the Court's stated intention to deal with the case as quickly as possible. The Government thanks you very much for this diligence.*
>
> *As mentioned above, the procedure before the Belgian Council of State should be completed shortly. In the event of a ruling rejecting the Council of State's request for annulment, there will no longer be any obstacle at the Belgian level to the extradition of the*
> *applicant. The Belgian Government assumes that the decision of your Court will be taken quickly after the decision of the Council of State.*

Now, by a letter from the ECtHR dated September 25, 2013, the parties are informed that the application is expected to be considered by the ECtHR at one of its next meetings in late October or early November 2013 ;

It is true that on October 18, 2013, the Court informed the parties of the intention of the Chamber constituted to examine the case to relinquish jurisdiction in favor of the Grand Chamber, pursuant to Article 30 of the Convention, but by that date, the appellant had already been handed over to the American authorities, so that the intention of the Court could not have had any influence on this handover;

the conflict between the obligations of the Belgian State under the European Convention on Human Rights and its obligations under the bilateral extradition agreement with the United States.

Court of Appeal Brussels -2020/AR/508 - p. 52

Court of Appeal Brussels - 2020/AR/508 - p. 51

United States does not justify the surrender of the appellant with respect to his subjective rights.

The risk that a State party to the ECHR might have to renounce an extradition because it would be judged contrary to the ECHR by the ECHR Court, does not constitute, with regard to the respect due to the subjective rights of the person concerned, a cause likely to justify the violation of his or her rights (i) to respect for a suspension measure ordered by this same Court, (ii) to the effectiveness of the appeal he or she has lodged, and (iii) not to be extradited if there is a proven risk of being subjected to inhuman and degrading treatment;

It should be noted, however, that the claimed conflict has not been demonstrated. In fact, according to article 6.2. of the Bilateral Convention on Extradition between the Kingdom of Belgium and the United States of America of 27 April 1987

*"Humanitarian Clauses*

*2. Notwithstanding the provisions of this Convention, the government of the requested State may not grant extradition for humanitarian reasons provided for by its national law.*

And according to article 2 bis of the law of 15 March 1874 on extraditions

*"Extradition cannot be granted if there is a serious risk that the person, if extradited, would be subjected in the requesting State to torture or inhuman and degrading treatment.*

In vain, the Belgian State claims that it could have legitimately believed that the diplomatic guarantees given by the American authorities eliminated the risk of the appellant being subjected to an incompressible sentence and therefore the risk of a violation of article 3 of the ECHR. As noted in the judgment of the ECHR Court of 14 September 2014:

- it appears from the provisions of the U.S. legislation (referred to in the diplomatic note of August 10, 2020 provided by the U.S. authorities) that they do not provide for the possibility of parole, mandatory or discretionary, and that a reduction of sentence may occur in the event of substantial cooperation of the appellant in the investigation of his case or in the prosecution of third parties, or in the presence of compelling humanitarian reasons. It also indicates that a prisoner may apply for commutation of his sentence or a presidential pardon, but this is done under very general and vague provisions that do not achieve the desired precision, while in this case the American authorities have at no time provided assurances that the appellant would escape a life sentence or that, if such a sentence were imposed, it would be accompanied by a reduction or commutation of the sentence

- *"if the said provisions demonstrate the existence of a "chance for enlargement" -*



*even if there may be doubts about the reality of this chance in practice - none of the procedures provided for resembles a review mechanism requiring the national authorities to investigate, on the basis of objective and pre-established criteria of which the detainee would have been aware with certainty at the time of the imposition of the life sentence whether, during the course of the sentence, the person concerned has developed and progressed to such an extent that there is no legitimate penological reason for his continued detention*";

finally, even if this case law was not foreseeable at the time of the appellant's surrender, in view of previous judgments of the European Court of Human Rights on the notion of an incompressible sentence, the Belgian State could not, as a party bound by the European Convention on Human Rights and bound to respect it with regard to the appellant as long as he was under its jurisdiction substitute its assessment for that of the European Court of Human Rights on the value of the guarantees given by the American authorities with regard to article 3 of the ECHR, while an appeal was pending before the European Court of Human Rights.

The Belgian State thus deliberately and consciously chose to give in to the insistence of the American authorities and to disregard its obligations towards the appellant, for which it must be held accountable as required by articles 1382 and following of the Civil Code.

63.

These legal provisions oblige the person who has committed a fault to repair the damage that would not have occurred, as it did, without this fault.

If the Belgian State had complied with the injunction not to extradite the appellant before the judgment on the merits of the violations complained of by the appellant, the appellant would not have been extradited. Without the violation of this injunction, the appellant would not have been incarcerated or prosecuted for any act in the United States, and he would not be at risk of being convicted in the United States, by any sentence whatsoever.

The causal link is therefore demonstrated between the illegal and wrongful surrender of the appellant to the U.S. authorities and the damages claimed.

Consequently, it is not necessary to examine the other breaches invoked by the appellant, as such an examination is not likely to provide him with any further redress, especially since many of these grievances are inadmissible on the basis of the statute of limitations, given their age.



8.  *Absence of prescription and obstacle* resulting *from the judgment of the Court of Human Rights and the resolution of the Committee of Ministers*

64.

The liability action arising from the violation by the Minister of Justice and his agents of the provisional measure ordered by the EDH Court and of article 34 of this Convention is not time-barred. In fact, it was committed on October 3, 2013 and this remission is invoked in citation; the five-year statute of limitations governed by Article 2262bis, paragraph 2, of the Civil Code expired on October 3, 2018 at midnight, the day of the citation.

65.

Moreover, contrary to the Belgian State's objection, the just satisfaction granted by the Court of Human Rights and the resolution of the Committee of Ministers of the Council of Europe responsible for verifying the execution of the judgment of September 14, 2014 in accordance with Article 46 of the European Convention on Human Rights (cf. the Statement of Facts), do not constitute an obstacle to calling into question the Belgian State's civil liability for the violation of the suspension measure.

For the reasons stated by the Court of Cassation in the judgment of October 1, 2021, C.20.0414.F/1, www. uroortal.be, neither the equitable compensation awarded by the judgment of the Court EDH of September 104, 2014, nor the resolution of the Committee of Ministers affect the admissibility of the requests recalled above

*"Article 32, paragraph fer, of the Convention for the Protection of Human Rights and Fundamental Freedoms provides that the jurisdiction of the European Court of Human Rights shall extend to all questions concerning the interpretation and application of this Convention and its Protocols which are submitted to it under the conditions laid down in Articles 33, 34, 46 and 47.*

*Under Article 46, § fer, of the Convention, the States Parties to the Convention undertake to abide by the final judgments of the Court in cases to which they are parties.*

*In accordance with Article 41, if this Court finds that there has been a violation of the Convention or its Protocols, and if the domestic law of the State party to the dispute only imperfectly remedies the consequences of that violation, it shall, if appropriate, afford just satisfaction to the injured party.*

*It follows from these provisions, on the one hand, that a judgment of the European Court of Human Rights which finds a violation of a provision of the Convention or its protocols obliges the State which is responsible for it to put an end to the violation and to erase its consequences so as to restore as far as possible the situation prior to the violation, on the other hand, that if the national law does not allow, or allows only imperfectly, to erase the consequences of the violation, the Court has the power to grant the injured party a remedy,*



*If applicable, the satisfaction that seems appropriate.*

*The obligation of a Contracting State to comply with a judgment of the European Court of Human Rights finding a violation of a provision of the Convention or its Protocols is not to be confused with any obligations it may have under national law.*

*The fact that this Court has given a judgment finding such a violation and awarding the injured party just satisfaction under Article 41 of the Convention does not prevent the national authorities of the Contracting State from awarding that party additional compensation which is not based on Articles 41 and 46 of the Convention but on provisions of domestic law which, such as Articles 1382 and 1383 of the former Civil Code,* require *full reparation for damage caused to another person by a fault of the State.*

As Advocate General Th. Werkin expressed it in his conclusions preceding the judgment

*"The procedure for seeking just satisfaction for damage suffered as a result of a State's violation of a provision of the Convention is a procedure independent of that provided for by a State's domestic law to enable the applicant to obtain full reparation for the damage suffered, based on Article 1382 of the Civil Code and which, relying on a very (and too) subjective assessment of the nature of that damage, grants a "partial" form of reparation; he just satisfaction granted by the Court does not therefore exclude the institution of proceedings* before *the national court to obtain full compensation for the damage suffered based on Article 1382 of the Civil Code because of the violation by a State of a provision of the Convention;*

*- the res judicata effect of the Court's judgments is governed by its own rules based on various provisions of the Convention, principally Articles 32, 41 and 46, § fer; of course, the positive effect implies that a judgment in which the Court declares that an act of the respondent State does or does not constitute a breach of an obligation under the Convention, or decides whether or not just satisfaction should be awarded, must be regarded as being in accordance with the truth; the res judicata effect is only relative the judgment is binding only on the parties to the proceedings within the limits of what has been finally decided by it; if the negative effect is that such a judgment prevents the* rehearing of *a similar claim, it follows from the different purpose and conditions of application, o n   t h e   o n e   h a n d ,  of a claim for just satisfaction and, on the other hand, of a claim for compensation for damage actually suffered, based on Article 1382 of the Civil Code, that the decision of the Court granting just satisfaction is not res judicata in relation to the national court seized of  a claim for compensation for the above-mentioned damage; Moreover, the Convention in no way prohibits the awarding by State bodies of compensation in addition to that granted by the Court by way of just satisfaction; it is incorrect to assert that, in ruling on Article 41 of the Convention, the Court has definitively settled the question of compensation for damage resulting from a violation of  a provision of the Convention or of the Convention itself.*



*In fact, one cannot validly oppose to such a request the authority of the res judicata of the decision rendered by the Court in* the field *of just satisfaction, since, on the one hand, the Court rules on the basis of article 41 of the Convention, and rules, moreover, in equity, without generally motivating its decision, and, on the other hand, the Belgian judge rules in the field of integral reparation on the basis of article 1382 of the Civil Code, at the end of a* duly *motivated reasoning;*

*since both sets of proceedings seek, in accordance with their own rules of assessment, to make good the damage suffered as a result of a violation by a State of a provision of the Convention, the national court shall take into account, where appropriate, the amount awarded by the Court by way of just satisfaction, in order to fix the amount of damages it intends to award to make good the damage actually suffered.*

66.

The compensation awarded by the European Court of Human Rights and the resolution of the Committee of Ministers constitute in this case all the less an obstacle to the full reparation required by articles 1382 et seq. of the Civil Code, since

The compensation awarded by the European Court of Human Rights only compensates for the moral damage suffered by the appellant as a result of *the violation of article 3 of* the European Convention on Human Rights found by the court, namely the extradition of the appellant to the United States, where he faces a life sentence that cannot be reduced;

the "guarantees" obtained by the Belgian State and judged sufficient by the Committee of Ministers do not in any way eliminate this risk, since, even if the life sentence will not in principle be requested by the Public Prosecutor's Office, it may be pronounced by the judge.

However, the judgment of the ECHR Court of 14 September 2014 finds that the appellant's extradition is contrary to Article 3 of the ECHR on the grounds that

- the appellant is subject to a "discretionary" life sentence in the sense that the judge may set a lesser sentence and decide to impose a fixed number of years;

- it appears from the provisions of the American legislation (referred to in the diplomatic note of August 10, 2020 provided by the American authorities) that they do not provide for the possibility of conditional release, mandatory or discretionary, and that a reduction of the sentence may occur in case of substantial cooperation of the appellant in the investigation of his case or in the prosecution of third parties, or in the presence of compelling humanitarian reasons. It also indicates that a prisoner may apply for commutation or presidential pardon, but this is done under very general and vague provisions that do not achieve the required precision, while in this case, the American authorities have at no time given any assurance that the appellant would escape a life sentence or that, in the event of the imposition of such a sentence, the appellant would be able to continue to serve his sentence.



Court of Appeal Brussels - 2020/AR/368 - p. 56

PAGE    01-00002881339-0055-0D66-01-02-4

sentence, it would be accompanied by a reduction or commutation of the sentence

- *"if the said provisions show the existence of a "chance of enlargement", even if doubts may be raised as to the reality of this chance in practice - none of the procedures provided for are akin to a review mechanism obliging the national authorities to investigate on the basis of objective and established criteria of which the prisoner would have been aware with certainty at the time of the imposition of the life sentence, whether, during the course of the sentence, the person concerned has developed and progressed to such an extent that there are no legitimate penal grounds for his continued detention.*

Therefore, notwithstanding the guarantees obtained by the Belgian government from the American authorities, the Belgian State's violation of Article 3 of the European Convention on Human Rights is not remedied as required by the principles of civil liability, according to which reparation must be in full, in kind, or, if impossible or unreasonably onerous, by equivalent.

### C.    Request for repatriation

67.

The appellant requests that the Belgian State be enjoined to <u>take all necessary steps to allow/facilitate his return to Belgium</u> by issuing a laissez-passer, organizing his return regardless of the conditions imposed by the United States, paying for his return, etc.

Repatriation of the appellant is certainly the most appropriate measure to end his incarceration and prosecution in the United States.

However, neither the above-mentioned bilateral extradition treaty, nor any other treaty, provides for the possibility for the Belgian State to demand from the American authorities the surrender of the appellant in order to make good the wrong committed.

Moreover, the principle of the separation of powers does not authorize the Court to order the Belgian State to organize the return of the appellant "regardless *of the conditions imposed by the United States*". Indeed, the Belgian government cannot be deprived of its discretionary power to assess the conditions that might be required in return by the American authorities.

68.

On the other hand, the Belgian State may be ordered to send a diplomatic note to the American authorities requesting the return of the appellant and undertaking to negotiate with them the possible terms of his repatriation and, if they agree, to issue the appellant with all the documents required for his travel and entry into Belgian territory.



The first injunction is accompanied by a fine of €10,000.00 per day of delay if it is not complied with at the latest on the 3rd day following the notification of the present judgment, with a maximum of 100.000,00 €. The Belgian State will have to justify its submission to the the appellant.

### D.    Appellant's medical condition claims: compensation and injunction

69.

The request to order the Belgian State, pending the appellant's return or in the event that he is unable to return, to organize monitoring of his health situation via the Belgian consular services in the United States is not admissible or at least not well-founded, in the absence of a subjective right on the part of the appellant to request consular assistance.

70.

On the other hand, he has the subjective right to obtain compensation for the damage suffered.

The file produced by the appellant contains several medical assessments of the appellant, the latest of which is dated March 2021; it is very detailed and is not the subject of any specific challenge by the Belgian State.

This medical evaluation was performed by a physician with 35 years of patient care experience, board certified in internal medicine, which involves treating adult patients with acute and chronic medical problems and retained by the Office of the Federal Public Defender in Washington, DC, to provide a medical evaluation of the appellant, seeking her opinion on the nature of the appellant's multiple medical problems and whether they are being treated appropriately during his incarceration.

It is reported as follows

> "To make this assessment, I reviewed the medical records in prison of Mr. Trabelsi that were provided to me by the federal defenders and that cover the last 4 years, from 2017 0 2021.
> First, it is important to note that Mr. Trabelsi was kept in solitary confinement for the duration of his incarceration in the United States. For the first 5 years, he slept on a hard floor and there was a light on in his cell 24 hours a day. From the records I reviewed, it appears that he never went outside. Also, since his native language is not English, he was not able to communicate effectively with anyone except in a rudimentary manner.



*I believe that this has led to serious mental health problems, often manifesting as physical problems, which have not been adequately addressed by the prison medical system. I will address these specific problems* later *in this letter.*

*A report written by a human rights expert with the United Nations, Nils Mel2'er, in February 2020, noted that dëshumanizing conditions of confinement, sometimes euphemistically referred to as "segregation," "secure housing," "hole," or "confinement," are commonly used by amëFlCalns correctional facilities. Melzer* noted *that such practices can exacerbate psychological suffering, particularly among inmates who may have experienced prior trauma or suffer from mental health disorders or psychosocial disabilities.*

*Melzer also stated that the serious and often irreparable psychological and physical consequences of solitary confinement and social exclusion are well documented and can range from progressively severe forms of anxiety, stress, and depression to cognitive impairment and suicidal tendencies.*

*The Mandela Rules, updated in 2015, are a revised minimum standard of UN rules that define solitary confinement as "the confinement of prisoners for 22 hours or more per day without meaningful human contact." Solitary confinement can only be imposed in exceptional circumstances, and "prolonged" solitary confinement for more than 15 consecutive days is considered a form of torture. As I have previously reported, Mr. Trabelsi has been in solitary confinement in the United States since October 2013, almost 8 years.*

*Mr. Trabelsi has a number of medical problems that are exacerbated by stress. First, he has a chronic stomach ulcer and ongoing problems with abdominal and stomach pain. In the records I reviewed, he repeatedly tried to have his diet changed to foods that would not exacerbate his pain. Because of the language barrier, it was difficult to know what he was asking for. N o one in the prison system made the effort to have a translator speak to him in person in a language in which he could effectively communicate his medical needs and clarify his dietary needs and issues. Prison officials did try to make a change, but it was not what he asked for and both parties were dissatisfied with the communication.*

*The response of the people in the prison to Mr. Trabelsi's requests for* food *that he could tolerate was to reprimand him for buying spicy food at the commissary. It has been repeatedly shown that spicy food does not cause ulcers and may even be beneficial, as the chemical that causes the ulcer is not present in the food.*



*Spicy taste decreases the production of acid in the stomach. I find it alarming that this type of information was offered to a patient instead of real medical treatment.*

*In addition, the mind-body connection between the brain and the gut is now well established. It is not at all surprising that a person in isolation would have stomach problems. Mr. Trabelsi received no evaluation, care, or treatment from a gastroenterologist between 2016 and 2018. When he saw a gastroenterologist and eventually underwent an endoscopy around August 2018, biopsies were performed and a follow-up appointment was required within three months. The endoscopy showed gastritis and*
*irregularity at the junction o f  the esopfige* and the *stomach. I could not find any pathology findings in the records I reviewed. When he was transferred to another*
*Established in September 2018, there was no evidence that anyone examined his pathology to see if there was a treatable cause for his pain. He saw a gastroenterologist again in May 2019, but the biopsy was inconclusive.*

*The results were not mentioned and the suggestions were to continue the medication he was already taking.*

*Mr. Trabelsi also reported frequent headaches. He indicated that these were exacerbated by having a bright light on 24 hours a day and that he was therefore unable to sleep. We know how important sleep is to IO SOfite'. The solution to this problem seemed obvious to me, but n o  one has ever turned off the light or put in a dim bulb at night. A CT scan was finally done, which showed no explanation f o r  his headaches. A CT scan is neither necessary nor sufficient to diagnose persistent headaches caused by lack of sleep. Effective communication with the patient would have revealed a clear and remediable diagnosis.*

*Mr. Trabelsi is also obese and has pre-diabetes. His current body mass index ("BMI") is 32. Obesity and diabetes can lead to many complications, including heart attacks and strokes. Lifestyle changes, such as diet and exercise, would improve and treat these conditions. In fact, the standard of care would be to prescribe diet and exercise changes. Mr. Trabelsi has not had the opportunity to exercise in almost 8 years. And he has no ability to control his diet.*

*A list of 15 of Mr. Trabelsi's blood pressure readings between March 2019 and February 2021 showed that 10 were above normal (120/80) and 5 above 150/90. These are levels that should raise concern. No medical professionals have commented on these elevated readings. A recent medication list indicates that he is now taking a blood pressure medication. However, high blood pressure is a problem that should first be treated with lifestyle modifications similar to those used for pre-diabetes and obesity ci-*



*on it. Without lifestyle changes, all of these problems are likely to get worse. And like obesity and pre-diabetes, high blood pressure can also lead to vascular disease, which can result in a heart attack or stroke.*

*In October 2020, Mr. Trabelsi had an alarmingly low vitamin D level. In fact, this is the lowest vitamin D level I have seen in my 35 years of practicing medicine. However, other than a multivitamin, which normally coFlt a small amount of vitamin D, this deficiency has not been adequately treated. Symptoms of vitamin D deficiency can include fatigue, muscle weakness, pain and depression. This deficiency is extremely easy to treat. It is not known how long he has been taking multivitamins, but it does not appear that his vitamin D levels have been retested. He needs a high dose of vitamin D, most likely for a few months, THEN a daily supplement of a replacement dose. He also needs follow-up blood work in the lab.*

*Mental health staff at the prison appear to attempt to conduct weekly assessments of Mr. Trabelsi, and report that he often refuses. Staff generally report that his mental health is "within normal limits." However, in October 2020, after an in-person court hearing, Mr. Trabelsi had a documented panic attack. In March 2019, Mr. Trabelsi stated that he would not speak to the mental health officer Without an in-person translator in a language in which he can effectively communicate his mental health needs. No in-person translator was offered or used for medical or mental health care or treatment. Years of isolation have most likely left him with severe psychological problems, but there appears to have been no real attempt to try to find a human being he could trust to speak to him in French. I fear that his withdrawal and unwillingness to be seen is evidence of severe mental distress rather than complete mental health, as indicated on the forms.*

*In March 2021, Mr. Trabelsi was noted to have worsening swelling of the) "ambe. He was given compression stockings and a diuretic w a s  added, apparently in addition to the one he was already taking for his blood pressure. The differential diagnosis of leg swelling includes heart disease, low blood protein, and venous stasis (weakened veins that leak fluid into the soft tissue of the lower extremities). The etiology of this problem has not been addressed. Diabetes, hypertension and obesity can lead to heart disease. No attempt was made to make a true diagnosis. A medical professional requested specific blood work due to her pain and swelling in her lower leg in November 2018, but it appears that no blood work was done until October 2020. As of December 2020, no diagnosis had been made. Diagnosing the etiology of leg swelling is not difficult, and once a diagnosis is made, the*



*Underlying medial problem, rather than the simple symptom of leg swelling, can be treated.*

*At present, Mr. Trabelsi has the following medical problems.*
*1. Gastroesophageal reflux.*
*2. Abdominal pain with occasional vomiting of blood. 3.pre-diabetes*
*4.obesity 5.high blood pressure*
*6. Edema (swelling) of the lower limbs*
*7. Depression, social anxiety, paranoia*
*8. Vitamin D deficiency*
*9. Headaches*

*His medications are as follows:*
*1. Triamterene/Hydrochlorothiazide 37.5/25 daily*
*2. Multivitamin 1 per day 3.Flonase nasal inhaler per day 4.Loratadine 10 mg per day*
*5. Omeprazole 40mg twice a day*
*6. Furosemide 20 mg per day*

*None of these problems, with the possible exception of high blood pressure, are effectively treated, or even diagnosed and monitored in a manner consistent with the standard of care. Some, such as his mental illness and vitamin D deficiency, are mostly ignored. His isolation, inability to interact w i t h other human beings, lack of sunlight and exercise, and constant artificial light that prevents him from sleeping normally combine to affect his mind and body in severely detrimental ways. As the months and years go by, it seems almost certain that his mental and physical condition will continue to deteriorate.*
*I declare, on this 26th day of March 2021, under penalty of perjury, that the foregoing is true and correct, in accordance with 28 U.S. Code, Section 1746.*


71.

The appellant claims a lump sum compensation of 103.500,00 € according to an *ex aequo et bono* evaluation on which he does not explain himself.

In view of the physical and mental disorders suffered by the appellant since his incarceration in the United States as described above, the court considers justified a lump-sum compensation *ex aequo et bono* of 10.000,00 € per year of detention in the United States, that is to say to date 10.000 x 9 + (10.000 : 12x10) , i.e. 98.333,00 € plus compensatory interest at the legal rate from the average date of October 2017 until the date of the present judgment and interest



judicial then.


72.

Pending specific assessments of the appellant's medical conditions, compensation for

      1 € provisional on an indemnity not currently assessable for future detention in the United States ;

      1 € provisional for medical expenses required by his state of health;

      1 € provisional in relation to the permanent disability resulting from his conditions of detention.


73.

Finally, in order for the appellant to benefit from adequate medical care, the Court enjoins the Belgian State to request from the American authorities the possibility for the appellant to receive visits and medical care from doctors chosen by him and to justify this request to the appellant's counsel within thirty days of the service of the present judgment, under penalty of a fine of €10,000.00 per day of delay, with a maximum of €100,000.00.


    *E.     Claims for Violation of the Right to Marry and Maintain Family Relationships*

74.

The appellant seeks €1 provisional for the costs necessary to maintain his family relations and compensation of €1,500, 00 for the damage caused by the violation of his right to marriage and family life with compensatory interest since October 3, 2013.


75.

The appellant demonstrates that he took the necessary steps on several occasions to marry Ms. BERROU and it is established that his surrender to the American authorities prevented him from contracting the marriage which was scheduled a few days later.

This remission being illegal and wrongful, it justifies the granting of the lump-sum compensation claimed on this count by the appellant, the requested amount of €1,500.00 being likely to adequately compensate for the moral damage suffered. The compensatory interest claimed since October 3, 2013 is also justified to compensate the loss resulting from the time elapsed between the occurrence of this damage and its repair.



76.

On the other hand, the request by which the appellant asks the Belgian State to pay a provisional €1 for the costs necessary to maintain family relations with this or any other person is not justified.

Indeed, there is no evidence before the Court that the relationship with Ms. Berrou continued beyond the end of 2015. Indeed, from January 2016, there is no trace of material assistance provided by Ms. Berrou to the appellant (using her own funds or sums collected from third parties, given the low income of Ms. Berrou with five dependent children) while, from November 2013 until that date, Ms. Berrou's bank account is used to send checks made out to the appellant. Furthermore, there are no letters, certificates, or evidence of telephone contact between the parties that demonstrate a continuing relationship between them since January 2016. Finally, Appellant proves no other familial relationship with any other person.

On these

grounds, the

Court,

Ruling contradictorily,

Having regard to the law of June 15, 1935 on the use of languages in judicial matters,

Reversing the judgment and ruling by way of new provisions,

Finds that the appellant's claim for compensation for the conditions of his detention in Belgium is admissible,

Declares that the appellant's claim for compensation for arbitrary detention for the purpose of his extradition is time-barred,



Court of Appeal Brussels -2020/AR/508 - p. 64

Orders the Belgian State to provide and produce the decisions regarding the appellant's conditions of confinement for the periods of January 2002 through October 2003, July 7, 2009 through July 24, 2013, and August 7, 2013 through October 3, 2013, as well as the decisions regarding the appellant's transfers for the period of July 7, 2009 through July 24, 2013, along with the accompanying administrative records, and places the case in continuance to allow the parties to argue;

Sets the cause for hearing on September 26, 2022 at 12:00 p.m. for 10 minutes to set the procedural schedule;

Declares inadmissible the main request to enjoin the Belgian State to cease judicial cooperation with the United States in the prosecution of the appellant,

Declares the subsidiary request for judicial cooperation admissible and well-founded, and enjoins the Belgian State to notify the present judgment to each of the persons who are or would be called to testify in the United States, inviting them to take due note of it, particularly with regard to the paragraphs concerning the violation of the principle of res judicata, the principle of *non bis in idem* and the principle of speciality in extradition, insofar as witnesses may be invited to appear before the American courts and be called upon to provide information relating to the facts excluded from the exequatur granted to the international arrest warrant;

Insofar as necessary, counsel for the appellant may make such disclosure to these witnesses themselves,

Enjoins the Belgian State to send a diplomatic note to the American authorities requesting the return of the appellant to Belgian territory and undertaking to negotiate with them the possible terms of this repatriation. Condemns the Belgian State to pay a fine of €10,000.00 per day of delay starting on the 30th day following the service of this judgment, up to a maximum of €100,000.00 in the event that this injunction is not complied with, which the Belgian State must justify to counsel for the appellant.

In case of agreement on the repatriation of the appellant, enjoins the Belgian State to issue to the appellant all the documents required for his travel and his entry on the Belgian territory,

Orders the Belgian State to pay the appellant compensation of

- 98,333.00 plus compensatory interest at the legal rate from the average date of October 1", 2017 to the date of this judgment and judicial interest thereafter ;

   1 provisional on a compensation not currently assessable for the appellant's future detention in the United States ;

- 1 € provisional for medical expenses required by the appellant's state of health;

- 1 € provisional in relation to the permanent incapacity resulting from its conditions of detention;


Enjoins the Belgian State to request from the U.S. authorities the possibility for the appellant to receive the visit and medical follow-up of the doctors of his choice and to justify this request to the appellant's counsels within thirty days of the service of the present judgment under penalty of a fine of 10.000,00 € per day of delay, with a maximum of 100.000,00 €;


Orders the Belgian State to pay the appellant compensation of €1,500.00 for violation of his right to marry, plus compensatory interest at the legal rate from October 3, 2013 until the date of this judgment and judicial interest thereafter ;


Orders the Belgian State to pay the costs of the two proceedings against Mr. TRABELSI and reserves the right to liquidate them in view of the reopening of the proceedings.


Thus judged and pronounced at the public civil hearing of the 1ᵉ'"chamber F of the Brussels Court of Appe! on September 12, 2022,



Court of Appeal Brussels - 2020/AR/508 - p. 66

Where were present and seated:

M. SALMON          President
H. REGHIF          Advisor
F. FOGLI           Advisor
A. MONIN           Clerk

A. MONIN

. REGHIF

F. FOGLI

M. SALMON

EXHIBIT 4

FEDERAL PUBLIC SERVICE
**JUSTICE**

**Directorate General Legislation, Fundamental Rights and Freedoms**

Central Authority international cooperation in criminal matters

| | |
|---|---|
| CONTACT | Steven Limbourg |
| TEL | +32 2 542 71 NN |
| E-MAIL | steven.limbourg@just.fgov.be |
| ADRESS | Boulevard de Waterloo 115, 1000 Brussels |

DATE        07 December 2022

| | |
|---|---|
| OUR REF.. | WL33/07/33.810/E |
| YOUR REF. | |
| COPY | LOBEUS |
| ANNEX | / |

Mrs. Colette FORD
Trial Attorney Office of International Affairs
1301 New York Avenue, NW Suite 800,
Keeney Building
WASHINGTON D.C. 20530 USA

Dear Mrs. FORD,

The judgment dated September 12th, 2022, by the Court of Appeal for Brussels ordered the Belgian Government to request the United States to allow Nizar Trabelsi to receive the visit of a medical doctor or medical doctors of his own choice.

For your convenience, the said judgment is attached to this note.

May I ask you to confirm receipt of this letter and its attachment.

Yours sincerely,

On behalf of the Minister of Justice

**Steven Limbourg (Authentication)**
Digitaal ondertekend door Steven Limbourg (Authentication)
Datum: 2022.12.09 16:53:42 +01'00'

Steven Limbourg
Director Criminal Law



EXHIBIT 5

PALAIS DES NATIONS • 1211 GENEVA 10, SWITZERLAND

**Mandates of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment; the Working Group on Arbitrary Detention; the Special Rapporteur on the right of everyone to the enjoyment of the highest attainable standard of physical and mental health and the Special Rapporteur on the promotion and protection of human rights and fundamental freedoms while countering terrorism**

Ref.: AL USA 1/2022
(Please use this reference in your reply)

25 February 2022

Excellency,

We have the honour to address you in our capacities as Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment; Working Group on Arbitrary Detention; Special Rapporteur on the right of everyone to the enjoyment of the highest attainable standard of physical and mental health and Special Rapporteur on the promotion and protection of human rights and fundamental freedoms while countering terrorism, pursuant to Human Rights Council resolutions 43/20, 42/22, 42/16 and 40/16.

In this connection, we would like to bring to the attention of your Excellency's Government new information we have received concerning the ongoing prolonged solitary confinement, under Special Administrative Measures (SAMs), of **Mr. Nizar Abdelaziz Trabelsi** and his deteriorating physical and mental health.

Mr. Trabelsi has been the subject of a previous communication sent on 16 December 2020 (USA 29/2020) by Special Procedures mandate holders, with regards to the severe mental impact of the prolonged solitary confinement Mr. Trabelsi has been subjected to since his extradition to the United States in 2013. We regret the lack of response from your Excellency's Government and remain concerned in light of the recent developments.

According to the information received:

Nizar Ben Abdelaziz Trabelsi is a Tunisian national born in July 1970 in Sfax. He was arrested on 3 September 2001 in his flat in Uccle, Belgium, and convicted of several offences under Belgian law, including terrorism charges, notably for attempting to commit a suicide attack on the Kleine Brogel military base, a NATO facility housing US military personnel. On 3 October 2013, Mr Trabelsi was extradited to the United States where he is currently imprisoned and awaiting trial, in the Northern Neck Regional jail. Mr. Trabelsi is restricted to his cell for 23 hours per day; is prevented from communicating with other prisoners and is deprived of adequate exercise, educational and work facilities, natural daylight, and adequate medical treatment.

*Concerns on physical and mental health*

On 30 October 2020, to assess the impact of prolonged solitary confinement on the mental and physical well-being of Mr. Trabelsi, his neuropsychiatrist re-examined him and reported findings of alarming levels of psychological distress and signs of psychosis, such as, hearing voices; experiencing sporadic hallucinations; periodic episodes of self-harm and suicidal thoughts; paranoia and obsessional preoccupations, amongst others.

On 28 March 2021, the Federal Public Defender's Office in Washington DC ordered a re-examination of Mr. Trabelsi's mental and physical state, in order to assess the continued impact of eight years of solitary confinement under SAMs. The report confirmed that most, if not all, previously identified and more recently developed medical conditions were exacerbated by the acute stress caused by the prolonged solitary confinement. More alarming still, would be the failure to adequately treat Mr. Trabelsi, as the report finds that out of nine illnesses, eight are incorrectly treated.

Most of Mr. Trabelsi's health conditions are treatable. His reported chronic headaches could be prevented by diming the artificial lights, on 24 hours a day in his cell and known to cause severe headaches due to sleep deprivation. His hypertension could be prevented by increasing the rate of sporting activities, also closely linked to high blood pressure. The alarming swelling in Mr. Trabelsi's legs, which considerably worsened recently, should have been diagnosed and treated more than three years ago when blood tests were ordered in 2018. The lack of adequate treatments has exacerbated the symptoms and if incorrectly treated, could lead to life threatening diseases.

These ailments are exacerbated by the reported lack of efforts made by the prison administration to find ways to adequately communicate with Mr. Trabelsi. Language barriers are known to aggravate an already acute sense of isolation. In one particular case, Mr. Trabelsi was not able to express his medical or dietary needs correctly to the prison guards. When requesting alimental adjustments for his stomach ulcer, the guards made little efforts to provide a translator and thus failed to take the appropriate measures, which has exacerbated his ulcer. The lack of response has continued to cause prolonged, unnecessary and preventable suffering to Mr. Trabelsi.

Mr. Trabelsi's mental health continues to deteriorate; he is presenting alarming signs of extreme general mistrusts and paranoia, causing him to recently reject contact with several of his attorneys. Furthermore, the rare in person interactions Mr. Trabelsi had with them and thus with the outside world, were reduced considerably due to the spread of the SARS-COV-2 virus; likewise he has not been able to withstand noise due to the ongoing headaches, making phone calls difficult. Mr. Trabelsi was recently permitted to receive a monitored phone call from his family. The last time he had spoken to them was in 2018. Since the previous communication, it has been observed with concern that Mr. Trabelsi has further withdrawn into himself.

Mr. Trabelsi is being denied appropriate medical and psychosocial support, further affecting his mental health and well-being, to the extent that he has engaged in desperate and self-destructive acts. His solitary confinement, his inability to interact with other human beings, his lack of sunlight and exercise and the constant artificial light causing severe sleep deprivation combined to impact his mind and body in harmful ways.

Furthermore, since his extradition to the United States in 2013, which according to the European Court of Human Rights was performed in violation of Article 3 of the European Convention of Human Rights (*Trabelsi v Belgium*, 2014), Mr. Trabelsi's pre-trial detention has been routinely extended

for the past eight years; with no apparent indication as to when his trial may take place, in serious violation of his right to a trial without undue delay. All stages of a criminal proceeding must take place "without undue delay", thus, appeals must also be handled expeditiously. The delay attributable to the COVID-19 pandemic cannot justify the current significant postponements in Mr. Trabelsi's judicial procedures.

While we do not wish to prejudge the accuracy of these allegations, we are seriously concerned by Mr. Trabelsi's prolonged pre-trial detention for over 8 years, and his uninterrupted solitary confinement under "Special Administrative Measures" (SAM) during that period, restricting all contacts with the outside world, including with family, affecting his mental and physical health to a point that it amounts to torture or other cruel, inhuman or degrading treatment or punishment.

Governments have the obligation to protect the right to physical and mental integrity of all persons deprived of their liberty in their custody. This right is set forth inter alia in the Universal Declaration of Human Rights (UDHR), the International Covenant on Civil and Political Rights (ICCPR) and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment and Punishment (CAT). In this connection, we are drawing the attention of your Excellency's Government to article 10, paragraph 1 of the ICCPR, which provides that "All persons deprived of their liberty shall be treated with humanity and with respect for the inherent dignity of the human person."

As of today, Mr. Trablesi has been subjected to 8 years of pre-trial detention in continued solitary confinement. This situation clearly can no longer be reconciled with the human right to due process and fair trial, including the right be tried with undue delay (Article 14.1.c ICCPR), which applies to all defendants including individuals prosecuted for terrorism-related offences. Furthermore, unduly prolonged pre-trial detention may also amount to arbitrary detention, which is prohibited under international human rights law in all circumstances, including during internal disturbances and armed conflict. In addition to international human rights law, the Fifth and Fourteenth Amendments of the US Constitution also guarantee the fundamental right to due process, which cannot be restricted or deprived through procedural practices that interfere with the overall right to claim justice.[1]

In connection with the above alleged facts and concerns, please refer to the **Annex on Reference to international human rights law** attached to this letter which cites international human rights instruments and standards relevant to these allegations.

We are issuing this letter in order to safeguard the rights of the above mentioned individual from irreparable harm, without prejudicing any eventual legal determination.

As it is our responsibility, under the mandates provided to us by the Human Rights Council, to seek to clarify all cases brought to our attention, we would be grateful for your observations on the following matters:

1.    Please provide any additional information and/or comment(s) you may have on the above-mentioned allegations.

---

[1]    Human Rights Committee, General Comment No. 32, UN Doc. CCPR/C/GC/32 (2007), para. 2

2.    Please provide legal and factual grounds for maintaining Mr. Trabelsi in continued solitary confinement from the date he was extradited to the USA until now, that is for an uninterrupted period of more than 8 years, in application of the Special Administrative Measures; and explain how those measures comply with international human rights law binding on the USA, and the related universally recognized standards, particularly in light of their physical and mental health effects.

3.    Please provide detailed information, including legal and other documents, regulating the use of solitary confinement against persons deprived of their liberty, at any stage of the legal proceedings, and after sentencing, including any provision aimed at mitigating the adverse effects of that practice on their physical and psychological health;

4.    Please explain why the prison administration does not seem to have taken any measure to modify the conditions of pre-trial detention of Mr. Trabelsi (i.e. over 8 years of solitary confinement), particularly in the light of two consecutive neuropsychiatric examinations 2020 and 2021, both of which corroborated each other, identified 9 ailments, and found that 8 of these were incorrectly treated.

5.    Please explain on which grounds a prison administration can ignore the results of two judicially-requested medical examinations, and continue to detain individuals in conditions that seriously threaten their mental and physical health and integrity and, therefore, must be regarded as cruel, inhuman or degrading?

6.    Please provide information on the steps taken by the Government or the judiciary to investigate the cruel, inhuman and degrading conditions under which Mr. Trabelsi has been detained for more than 8 years; to ensure personal and institutional accountability for such abuse, and to provide full redress and rehabilitation for the resulting harm.

7.    Please provide information on any measure taken, or envisaged to be taken, to provide adequate dietary regime and appropriate medical care including psychosocial support, to Mr. Trabelsi, in light of his seriously deteriorating physical and mental health.

8.    Please provide information on the steps taken to reform the practice of prolonged and indefinite solitary confinement in general; and when applied to persons with mental conditions and psychosocial disabilities in particular.

9.    Please provide detailed information on existing mechanisms, if any, to oversee and review in a systematic manner and on a regular basis the length and conditions of detention of pre-trial detainees, especially when they risk to seriously undermine the mental and physical health and integrity of a detainee.

10.    Please also describe existing avenues and mechanisms of reduction of sentences, namely with regard to life sentences, and in particular with regard to terrorism offenses, and the modalities of their implementation in practice.

While awaiting a reply, we respectfully urge that prompt measures be taken to review and alleviate the conditions of detention of Mr. Trabelsi with a view to bringing them into compliance with international human rights law and standards, most notably the absolute and non-derogable prohibition of torture and ill-treatment, including the prohibition of prolonged solitary confinement.

We would like to inform your Excellency's Government that after having transmitted an allegation letter to the Government, the Working Group on Arbitrary Detention may transmit the cases through its regular procedure in order to render an opinion on whether the deprivation of liberty was arbitrary or not. Such letters in no way prejudge any opinion the Working Group may render. The Government is required to respond separately to the allegation letter and the regular procedure.

We may publicly express our concerns in the near future in this case as, in our view, the information at hand is sufficiently reliable, indicates a matter warranting prompt attention, and raises serious human rights concerns which we believe the wider public should be informed of. Any public expression of concern on our part will indicate that we have been in contact with your Excellency's Government's to clarify the issue/s in question.

This communication and any response received from your Excellency's Government will be made public via the communications reporting website within 60 days. They will also subsequently be made available in the usual report to be presented to the Human Rights Council.

Please accept, Excellency, the assurances of our highest consideration.

Nils Melzer
Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment

Miriam Estrada-Castillo
Vice-Chair of the Working Group on Arbitrary Detention

Tlaleng Mofokeng
Special Rapporteur on the right of everyone to the enjoyment of the highest attainable standard of physical and mental health

Fionnuala Ní Aoláin
Special Rapporteur on the promotion and protection of human rights and fundamental freedoms while countering terrorism

**Annex**

**Reference to international human rights law**

In connection with above alleged facts and concerns, we would like to refer your Excellency's Government to the relevant international norms and standards that are applicable to the issues brought forth by the situation described above.

The prohibition of torture and other cruel, inhuman or degrading treatment or punishment, as an international norm of jus cogens, is reflected inter alia, in article 5 of the Universal Declaration of Human Rights (UDHR), articles 2 and 16 of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) and Article 7 of the International Covenant on Civil and Political Rights (ICCPR).

In this connection, we would like to bring to your Excellency's Government attention the comment of the Committee Against Torture stating that "while the State party has indicated that there is no systematic use of solitary confinement in the United States", the Committee remains concerned about reports of extensive use of solitary confinement and other forms of isolation in United States prisons, jails and other detention centres, for purposes of punishment, discipline and protection, as well as for health-related reasons." The Committee also raised concern about the use of solitary confinement for indefinite periods of time and its use with respect to juveniles and individuals with mental disabilities, stating that full isolation of 22 to 23 hours a day in super-maximum security prisons is unacceptable (art. 16). CAT/C/USA/CO/3-5 (CAT 2014).

In the Rapporteur's interim report to the General Assembly of 5 August 2011 (A/66/268), the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment defined solitary confinement, in accordance with the Istanbul Statement on the Use and Effects of Solitary Confinement, as the physical and social isolation of individuals who are confined in their cells for 22 to 24 hours a day. He observed that while solitary confinement for short periods of time may be justified under certain circumstances, with adequate and effective safeguards in place, the use of prolonged (in excess of 15 days under conditions of total isolation) or indefinite solitary confinement may never constitute a legitimate instrument of the State, as it may cause severe mental and physical pain or suffering, a point which has been reiterated in paragraph 28 of the General Assembly resolution 68/156. Prolonged or indefinite solitary confinement runs afoul of the absolute prohibition of torture and other cruel, inhuman or degrading treatment or punishment. Furthermore, due to the prisoner's lack of communication, as well as the lack of witnesses inside the prison, solitary confinement may also give rise to other acts of torture or ill-treatment.

Furthermore, the Special Rapporteur on Torture stressed that "[E]ven if permitted by domestic law, none of the following methods of inflicting mental pain or suffering can be regarded as "lawful sanctions": prolonged or indefinite solitary confinement; placement in a dark or constantly lit cell; collective punishment; and prohibition of family contacts. (In accordance with the Nelson Mandela Rule n.43). Even more extreme than solitary confinement is "incommunicado detention", which deprives the inmate of any contact with the outside world, in particular with medical doctors, lawyers and relatives and has repeatedly been recognized as a form of torture.

Furthermore, we would like to recall the updated United Nations Standard Minimum Rules for the Treatment of Prisoners (the Mandela Rules, 2015) which lay out generally accepted principles and practice in the treatment of prisoners and prison management. In particular, we would like to refer to Rules 43.1(b), 43.3, 44, 45 and 46 which refer to the use of disciplinary sanctions or restrictive measures, including solitary confinement and the role of health-care personnel regarding any adverse effect of disciplinary sanctions or other restrictive measures on the physical or mental health of prisoners subjected to such sanctions or measures.

Rule 43 of the Mandela Rules prohibits prolonged or indefinite solitary confinement and defines prolonged solitary confinement as solitary confinement for a time period in excess of 15 consecutive days in Rule 44. The Mandela Rules further specify that solitary confinement may be used only in exceptional cases as a last resort, for as short a time as possible and subject to independent review in Rule 45. Further, Rule 45.2, explicitly prohibit the imposition of isolation for punishment and prohibit the imposition of isolation "in the case of prisoners with mental or physical disabilities when their conditions would be exacerbated by such measures."

We would also like to underline conclusion of the Special Rapporteur on the promotion and protection of human rights and fundamental freedoms while countering terrorism, calling on States to "[E]nsure that all detainees are held in accordance with international human rights standards, including the requirement that all detainees be held in regularized facilities, that they be registered, that they be allowed contact with the outside world (lawyers, International Committee of the Red Cross, where applicable, family), and that any form of detention is subject to accessible and effective court review, which entails the possibility of release".

Paragraph 6 of General Comment No. 20 of the Human Rights Committee states that prolonged solitary confinement of the detained or imprisoned person may amount to acts prohibited by article 7 [on the prohibition of torture and other cruel, inhuman or degrading treatment or punishment] of the ICCPR.

We also would like to draw the attention of your Excellency's Government to the United Nations Standard Minimum Rules for the Treatment of Prisoners (the Mandela Rules, 2015) which lay out generally accepted principles and practice with regard the treatment of prisoners and prison management. In particular, Rule 43. 1 (a), (b) and (c) proscribe any restriction or disciplinary sanctions amounting to torture or other cruel, inhuman or degrading treatment or punishment including, most notably, indefinite solitary confinement; prolonged solitary confinement and the placement of a prisoner in a dark or constantly lit cell. Prolonged solitary confinement is defined in Rule 43 as any confinement of prisoners for 22 hours or more a day without meaningful human contact in excess of 15 consecutive days. Moreover, even below the absolute maximum duration of 15 consecutive days, solitary confinement can only be used as a last resort, for as short a time as possible and subject to independent review (Rule 45). Rule 46 even completely prohibits the solitary confinement of prisoners with mental or physical disabilities when their conditions would be exacerbated by such measures. In addition, article 7 of the Basic Principles for the Treatment of Prisoners provides that "efforts addressed to the abolition of solitary confinement as a punishment, or to the restriction of its use, should be undertaken and encouraged".

In his 2011 report to the UN General Assembly (A/66/268) the Special Rapporteur on torture stated that when solitary confinement inflicts severe mental and physical pain or suffering on a detainee it can amount to cruel, inhuman or degrading treatment or punishment and even torture. He specified that, beyond the limit of 15 consecutive days, some of the harmful psychological effects of isolation can become irreversible.

We respectfully remind your Excellency's Government of the relevant provisions of the United Nations Security Council resolutions 1373 (2001), 1456(2003), 1566 (2004), 1624 (2005), 2178 (2014), 2242 (2015), 2341 (2017), 2354 (2017), 2368 (2017), 2370 (2017), 2395 (2017) and 2396 (2017); as well as Human Rights Council resolution 35/34 and General Assembly resolutions 49/60, 51/210, 72/123 and 72/180. All these resolutions require that States ensure that any measures taken to combat terrorism and violent extremism, including incitement of and support for terrorist acts, must comply fully with all their obligations under international law. In this regard, we also wish to refer to the Human Rights Council resolution 22/6, which urges States to ensure that measures to combat terrorism and preserve national security are in compliance with their obligations under international law and do not hinder the work and safety of individuals, groups and organs of society engaged in promoting and defending human rights.

We would also like to reiterate the Ruling of the European Court of Human Rights in *Vinter and Others v UK (2013),* which concluded that "[A] whole life prisoner is entitled to know, at the outset of his sentence, what he must do to be considered for release and under what conditions, including when a review of his sentence will take place or may be sought. Consequently, where domestic law does not provide any mechanism or possibility for review of a whole life sentence, the incompatibility with article 3 on this ground already arises at the moment of the imposition of the whole life sentence and not at a later stage of incarceration. The Court elaborated on this standard in the *Trabelsi v Belgium* (September 2014) by holding that the necessary review mechanism must enable the national authorities to ascertain, on the basis of objective, pre-established criteria of which the prisoner had precise cognisance at the time of imposition of the life sentence, whether, while serving his sentence, the prisoner has changed and progressed to such an extent that continued detention can no longer be justified on legitimate penological grounds.

Finally, we would like to recall that, in line with UN Security Council resolutions, the Special Rapporteur on human rights while countering terrorism has, on numerous occasions, noted that all measures adopted in the context of countering terrorism, including those dealing with the rights of non-nationals, deportations and extradition must comply with international human rights law. Therefore, any transfer of a terrorism suspect or convict from one State to another must be based on law and follow the procedures set forth in law. Further, there is a right to an effective review mechanism for any decision to expel, deport or extradite. Article 13 of the International Covenant on Civil and Political Rights provides that "An alien lawfully in the territory of a State Party to the present Covenant may be expelled therefrom only in pursuance of a decision reached in accordance with law and shall, except where compelling reasons of national security otherwise require, be allowed to submit the reasons against his expulsion and to have his case reviewed by, and be represented for the purpose before, the competent authority or a person or persons especially designated by the competent authority." The Human Rights Committee has clearly stated that the right to challenge an expulsion decision and to have one's case

reviewed applies not only to expulsion and deportation decisions, but also to extradition, including when the State invokes reasons linked to national security. The review proceedings must provide a real opportunity to submit reasons against deportation or extradition (Human Rights Committee, Pierre Giry v. Dominican Republic, Communication No. 193/1985, U.N. Doc. CCPR/C/39/D/193/1985 (1990)). The right to be expelled, deported or extradited only on the basis of a decision adopted in accordance with the applicable law, and to submit reasons against expulsion and to have them examined, applies also in the case of terrorism suspects. Similarly, all aspect of the right to a fair trial must be respected, even when dealing with acts of terrorism. This includes the application of the rule *ne bis in idem*, guaranteed under article 14(7) of the International Covenant on Civil and Political Rights.

EXHIBIT 6



**FEDERAL PUBLIC SERVICE**

**JUSTICE**



**CENTRAL AUTHORITY**

International Co-operation in Criminal Matters

_____

Waterloolaan 115 Boulevard de Waterloo

1000 Brussels, BELGIUM

Mrs. Colette FORD

Trial Attorney OIA-DOJ

1301 New York Avenue, NW Suite 800, Keeney Building

Washington D.C. 20530

UNITED STATES OF AMERICA

**URGENT**

| | |
|---|---|
| Date | 05 March 2020 |
| Y. Ref. | |
| O. Ref. | WL33/33.810/ E |
| Re | EXTRADITION – Nizar TRABELSI : notification of judgment of the First Instance (Civil) Court for Brussels dated February 26, 2020 |

Dear Mrs. Ford,

On February 26th, 2020, the First Instance (Civil) Court for Brussels has ordered the Belgian Government to formally notify its judgment, including the following wording as translated into English :

"In accordance with the analysis that prevails in Belgium, the extradition of Mr Trabelsi does not make possible to prosecute him in the United States so that he can be tried for the facts stated in the Overt Acts nos 23, 24, 25 and 26 contained in paragraph 10 of the first charge and supposedly repeated in support of the other charges *[of the U.S. warrant of arrest that is at the root of the extradition (indictment by the Grand Jury dated 3 November 2006, filed with the clerk's office of the U.S. District Court of the District of Columbia]*, i.e. the facts related to the planned attack on Kleine Brogel military base.

With the exception of the words in italics and between brackets, the conclusion is the one contained in paragraph 41 of the judgement issued by the Court of appeal of Brussels in summary proceedings and transmitted by the Belgian authorities to the US Department of Justice on 9 August 2019.

The French-speaking Court of First Instance of Brussels came to the same conclusion for the reasons set out in the judgement on the merits enclosed herewith (in particular nos 123 to 135 of this judgement)."

1 / 1

May I ask you to confirm receipt of this letter and its attachment.

Yours sincerely,
On behalf of the Minister of Justice

Steven LIMBOURG
Counsellor-general
Department of Criminal law

T.  +32 2 542 67 59    •    F.  +32 2 542 67 67    •    @    erik.verbert@just.fgov.be

1817

EXHIBIT 7

3/30/23

RANDOLPH D. MOSS       DATE
United States District Judge

Honorable Judge

Moss

I'm VERY FAR To be Ready For TRIAL I Blame The Defender For betraying please: AS you KNow i'm a Foreign inmate

when I came To U.S.A I DiDnT speak 1 woRD in

english I TRied to learn isnT easy To use The

DictionaRy aonlye and Do NoT have CoNTACT with

inmaTes   I'm innocenT inmate. 22 yooks in pRison

becouse ThaT whot BElgium GoveRnmenT wanTed. I was

ToRTuRed, and beTRayed by The BElgium GoveRnment

Now I wanT To TALK about whot happened To me on

2001 → 2013: I wanTed The case help me To consTRACT

my story. The TRue story   I ASked The pubic defendeR

oFFice To Give me my case in a FRench languages,

FRom 2014 unTil 2017 = I DiDnT get (1 pages) They

lying To me. manipulated me. and violaTed my Right

To Reid my case. on 2017 you becam judge in my

case  The FiRst Thing I DiD is To ASk you by (2 letTeR)

my problem with public Defender lawyer and my Need

Ms PETRAS my Ex lawyer to fix This issue. she Told you

They have budget issue but I she will TALK To her Boss

Mr Kromer. NO answer To me and No Document. So I

Decided To TALK To you face To face About This problem

Ms PETRAS again used lying and monipulation To protect

her Boss. During The COVID19 I continue To ASK About

my case because The Trial was for I Think 3/2021

I Told Them I cant Go To Trial without my case

I get letter from My Reload lawyer by p Defender she

Explained To me The problem. in The last hearing on 3/30/2023

The Translater Read it To you The letter which The p Defender

office Said clear That judge Moss Gave a order To The

Government To Translate my case. Mr Eisenstein Sent o email

To The Government. The Government Refuse and denied The Question

according To your self " you DiDn'T Say That To Them,,

which mean They (lying) To me Since (9 years) I will

file a Motion. TO obTain a Translation of my whole case and

To protect myself F IF anyThing bad hopen During my Trial.

So ThaT I can ASK For MisTRial. Due To inEfEcTive consel. Thonks.

EXHIBIT 8

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES,

v.

NIZAR TRABELSI,

     *Defendant.*

No. 06-cr-89 (RDM)

**<u>ORDER</u>**

In the interest of clarity, the Court notes the following:

1. At this time, the Court has not ordered a competency evaluation of Defendant Trabelsi. The Court did grant standby counsel's request for funding to hire a psychologist to conduct an independent evaluation of Trabelsi and ordered, in light of the fast-approaching trial date, that any such evaluation should be completed no later than April 17, 2023. As the Court explained in its April 13, 2023 memorandum opinion (attached to this order as Appendix A), "standby counsel have failed to produce any evidence that Trabelsi suffers from a 'severe mental illness,' rendering him incompetent to conduct the trial on his own." Dkt. 562 at 11. The Court also noted that, "over the course of many lengthy hearings held over the last several months, . . . the Court has not observed any behavior—or change in behavior—that would cause it *sua sponte* to question Trabelsi's competence to represent himself." *Id.*

2. As the Court's April 13, 2023 memorandum opinion also confirmed, the trial remains scheduled to commence on May 8, 2023. *Id.* at 13. Although, on April 12, 2023, the Court raised the question of whether the trial should be delayed by three weeks to permit

for prescreening of juror availability, the Court has concluded that such a delay is

inappropriate because it will result in the unavailability of at least two government

witnesses.  *See* Dkt. 559 at 2 ("[T]wo out of five overseas witnesses . . . are refusing to

testify if the trial is delayed again, and the government is still waiting to hear from the

others.").  Moreover, in light of the government's representation that trial is unlikely to

last more than seven weeks, Dkt. 557 at 3, the Court does not anticipate that jury selection

will take more than a few days.

3.  In an April 13, 2023 status report, standby counsel represented that "th[is] case involves a

*pro se* defendant who will be conducting the jury selection."  Dkt. 556 at 1.  But at a

January 10, 2023 status conference addressing jury selection, standby counsel

represented—after conferring with Trabelsi—that standby counsel "w[ould] do the jury

selection."  Hrg. Tr. (Rough at 7:4–5).  The Court noted that, "if [Trabelsi] has a change of

heart and thinks he wants to do [jury selection] instead," the Court would not allow the

parties directly to question potential jurors.  *Id.* at 7:6–14.  If Trabelsi wishes to conduct

the jury selection himself, the Court will, as authorized by Fed. R. Crim. P. 24(a),

"examine prospective jurors" and "permit the attorneys for the parties," including

Trabelsi, to "submit further questions that the court may ask if it considers them proper."

Fed. R. Crim. P. 24(a)(1), (2)(B).

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  April 14, 2023

2